THOMAS J. GODDARD
thomas@goddard.app
190 Andover Dr.
Vacaville, CA 95687
Telephone: (415) 985-5539
Plaintiff, pro se
Pepperdine University
Administrative Law & Litigation + International Law

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| THOMAS JOSEPH GODDARD,<br>Plaintiff,<br>v.<br>APPLE INC.,<br>Defendant. | Case No. 3:25-cv-06187-JSC<br><br>**THIRD AMENDED COMPLAINT**<br>DEMAND FOR JURY TRIAL |

# TABLE OF CONTENTS


TABLE OF AUTHORITIES 5

A. CASES 5

B. STATUTES 7

C. RULES 8

D. REGULATIONS 9

E. OTHER AUTHORITIES 9

I. INTRODUCTION 10

A. RESPONSE TO COURT'S FEBRUARY 9, 2026 ORDER (DOCUMENT 74) 10

B. COMPLIANCE WITH COURT'S OCTOBER 21, 2025 ORDER 12

II. PARTIES & JURISDICTION 15

III. REQUEST FOR ACCOMMODATIONS UNDER THE ADA 19

IV. JURISDICTION & VENUE 19

V. INTRADISTRICT ASSIGNMENT—OAKLAND DIVISION 21

VI. NO ADMINISTRATIVE EXHAUSTION REQUIRED 21

VII. FACTUAL ALLEGATIONS 21

A. The October 7, 2023 (**Exhibits E, Q**) Catalyst 22

B. Apple's Corporate Structure Enabling Discriminatory Decision-Making 25

C. Apple Employment Discrimination & Fair Credit Reporting Act Violations 26

D. Pattern Evidence: Antisemitic & Racial Discrimination Across Employers 38

E. Prima Facie Case Against Apple—Iqbal/Twombly Plausibility Standard 40

F. Economic Damages from Discriminatory Conduct 43

G. The Manager FAQ: Documentary Evidence of Conspiracy 43

VIII. [CHRONOLOGICAL EVENT DOCUMENTATION] 44

A. Statistical Framework & Analysis 45
1. Full Dataset Analysis (680 events) 45
2. Category Distribution Analysis 45
IX. CAUSES OF ACTION 46
A. PATTERN EVIDENCE SUPPORTING DISCRIMINATION CLAIMS 46
B. TWELFTH CAUSE OF ACTION 48
1. Response to Fraud Pleading Deficiency 50
2. Rockwell Evidence Is Documented, Not Speculative 51
C. THIRTEENTH CAUSE OF ACTION 51
D. Logical Fallacies Undermining Apple's Motion 54
E. SIXTEENTH CAUSE OF ACTION 55
F. Supreme Court's 2024 Expansion of Discrimination Protections 58
G. Medical Crisis Causation & ADA Violations 59
X. DAMAGES 60
A. Damages Framework for the Three Sustained Claims 60
B. Economic Damages: According to Proof, Not Less Than $1,050,000 61
C. Non-Economic Damages: According to Proof, Not Less Than $500,000 61
D. FCRA Statutory Damages 61
E. Punitive Damages Within Constitutional Limits 62
F. Total Compensatory Damages: Not Less Than $1,550,000 62
G. Precedent Support 62
H. Preservation of UCL Claim for State Court 68
XI. PRAYER FOR RELIEF 68
A. Response to Court's Misjoinder Ruling 68
XII. INJUNCTIVE RELIEF 71
XIII. ATTORNEY'S FEES & COSTS 81
XIV. TIMELINESS & TOLLING OF STATUTES OF LIMITATIONS 82
XV. DEMAND FOR JURY TRIAL 84

XVI. VERIFICATION 85

XVII. CERTIFICATE OF COMPLIANCE 92

XVIII. EXHIBITS INCORPORATED BY REFERENCE 96

## TABLE OF AUTHORITIES

### A. CASES

**United States Supreme Court**

*Ames v. Ohio Dep't of Youth Services*,
604 U.S. 270 (2025) .......... 23, 45, 67

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......... *passim*

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) .......... *passim*

*Burlington Northern & Santa Fe Railway Co. v. White*,
548 U.S. 53 (2006) .......... 18, 34, 89

*Castaneda v. Partida*,
430 U.S. 482 (1977) .......... 1, 15, 29, 44, 58, 72

*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*,
20 Cal. 4th 163 (1999) .......... *passim*

*Crawford v. Metropolitan Government of Nashville*,
555 U.S. 271 (2009) .......... 21, 45

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993) .......... 12, 38, 56

*Davis v. Monroe County Board of Education*,
526 U.S. 629 (1999) .......... 33, 67

*Erickson v. Pardus*,
551 U.S. 89 (2007) .......... *passim*

*Farmer v. Brennan*,
511 U.S. 825 (1994) .......... 41, 78

*Gebser v. Lago Vista Independent School District*,
524 U.S. 274 (1998) .......... 29, 55

*Hazelwood School District v. United States*,

433 U.S. 299 (1977) .......... 1, 16, 31, 47

*Kolstad v. American Dental Association*,
527 U.S. 526 (1999) .......... 52, 88

*McDonnell Douglas Corp. v. Green*,
411 U.S. 792 (1973) .......... 14, 26, 39

*Muldrow v. City of St. Louis*,
601 U.S. 346 (2024) .......... 19, 42, 66

*Murray v. UBS Securities, LLC*,
601 U.S. 23 (2024) .......... 1, 2, 8, 17, 25, 36, 48, 59

*National Railroad Passenger Corp. v. Morgan*,
536 U.S. 101 (2002) .......... 3, 27, 51

*Olmstead v. L.C.*,
527 U.S. 581 (1999) .......... 35, 69

*Tennessee v. Lane*,
541 U.S. 509 (2004) .......... 36, 70

*Texas Department of Community Affairs v. Burdine*,
450 U.S. 248 (1981) .......... 28, 40

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011) .......... 1, 30, 46

*Watson v. Fort Worth Bank & Trust*,
487 U.S. 977 (1988) .......... 32, 54

**United States Courts of Appeals**

*EEOC v. Federal Express Corp.*,
558 F.3d 842 (9th Cir. 2009) .......... 1, 31

*Fort Bend County, Texas v. Davis*,
587 U.S. 541 (2019) .......... 18, 40

*Hollis v. R&R Restaurants, Inc.*,
No. 24-2464 (9th Cir. Nov. 18, 2025) .......... 20, 42, 66

*Oppenheimer v. Prudential Securities, Inc.*,
94 F.3d 189 (5th Cir. 1996) .......... 24, 53
*Rochon v. Gonzales*,
438 F.3d 1211 (D.C. Cir. 2006) .......... 20, 43
*Swierkiewicz v. Sorema N.A.*,
534 U.S. 506 (2002) .......... 16, 38
*Swinton v. Potomac Corporation*,
270 F.3d 794 (9th Cir. 2001) .......... 37, 61
*Villiarimo v. Aloha Island Air, Inc.*,
281 F.3d 1054 (9th Cir. 2002) .......... 44, 68

**United States District Courts**

*Doe v. Reddit, Inc.*,
No. 3:23-cv-00183-VC (N.D. Cal. 2023) .......... 49

**B. STATUTES**

**United States Code**

15 U.S.C. § 1681 et seq. (Fair Credit Reporting Act) .......... 22, 50
15 U.S.C. § 78u-6 (Securities Exchange Act § 21F) .......... 13, 38
18 U.S.C. § 1030 (Computer Fraud and Abuse Act) .......... 23, 49, 75
18 U.S.C. § 1343 (Wire Fraud) .......... 11, 24, 48
18 U.S.C. § 1512 (Tampering with witness) .......... 41, 77
18 U.S.C. § 1514A (Sarbanes-Oxley Act § 806) .......... 2, 9, 17, 25, 33, 44
18 U.S.C. § 1519 (Obstruction of justice) .......... 42, 76
28 U.S.C. § 1331 (Federal question jurisdiction) .......... 5
28 U.S.C. § 1367 (Supplemental jurisdiction) .......... 5
29 U.S.C. § 794 (Rehabilitation Act § 504) .......... 3, 34, 68
29 U.S.C. § 2601 et seq. (Family and Medical Leave Act) .......... 26
42 U.S.C. § 1981 (Equal rights under the law) .......... 4, 15, 39
42 U.S.C. § 1983 (Civil action for deprivation of rights) .......... 40, 73

42 U.S.C. § 1985 (Conspiracy to interfere with civil rights) .................. 4, 16, 41, 74

42 U.S.C. § 2000e et seq. (Title VII of the Civil Rights Act) .......... 1, 3, 10, 18, 27, 35

42 U.S.C. § 2000e-6 (Pattern or Practice—evidentiary standard only, no standalone claim per Court's Order) .................................................... 30

42 U.S.C. § 12101 et seq. (Americans with Disabilities Act) ..................... 3, 34, 68

**California Statutes**

Cal. Gov. Code § 12900 et seq. (Fair Employment and Housing Act) ............... 6, 28

Cal. Gov. Code § 12940 (Prohibited employment practices) ...................... 28, 56

Cal. Ins. Code § 10110.6 (Disability insurance benefits) ........................ 11, 63

Cal. Lab. Code § 1102.5 (Whistleblower protection) ............................ 29, 57

Cal. Penal Code § 422.55 (Hate crimes) ............................................. 64

Cal. Unruh Civil Rights Act (Cal. Civ. Code § 51 et seq.) ........................... 65

**C. RULES**

**Federal Rules of Civil Procedure**

Fed. R. Civ. P. 8 (General Rules of Pleading) ........................................ 7

Fed. R. Civ. P. 9(b) (Fraud or Mistake; Conditions of Mind) ........................ 12

Fed. R. Civ. P. 11 (Representations to the Court) ................................... 71

Fed. R. Civ. P. 15 (Amended and Supplemental Pleadings) ........................... 7

Fed. R. Civ. P. 23 (Class Actions) ........................................... 30, 60

Fed. R. Civ. P. 26 (Duty to Disclose; General Provisions) ....................... 24, 53

Fed. R. Civ. P. 37 (Failure to Make Disclosures or Cooperate) ................... 53, 79

Fed. R. Civ. P. 56 (Summary Judgment) .............................................. 58

Fed. R. Civ. P. 65 (Injunctions and Restraining Orders) ............................ 80

**Federal Rules of Evidence**

Fed. R. Evid. 401 (Test for Relevant Evidence) ....................................... 38

Fed. R. Evid. 702 (Testimony by Expert Witnesses) ............................. 12, 38

Fed. R. Evid. 803 (Exceptions to the Rule Against Hearsay) .......................... 45

Fed. R. Evid. 901 (Authenticating or Identifying Evidence) ........................... 45

**Local Rules**

N.D. Cal. Civ. L.R. 3-4 (Civil Cover Sheet) .......... 7
N.D. Cal. Civ. L.R. 7-12 (ADA Accommodations) .......... 3, 34
N.D. Cal. Gen. Order No. 56 (Disability Accommodations) .......... 3, 34

**D. REGULATIONS**

29 C.F.R. § 1614.103 (Complaints of discrimination) .......... 10
29 C.F.R. § 1980.103 (Employee protection provisions) .......... 17
29 C.F.R. Part 24 (Procedures for whistleblower protections) .......... 17
45 C.F.R. § 86.31 (Education programs receiving Federal financial assistance) .......... 35

**E. OTHER AUTHORITIES**

Executive Order 13899, Combating Anti-Semitism, 84 Fed. Reg. 68779 (Dec. 11, 2019) .......... 8, 19
Executive Order 14188, Additional Measures To Combat Anti-Semitism, 90 Fed. Reg. 7229 (Jan. 29, 2025) .......... 8, 19
EEOC Compliance Manual § 15 (Religious Discrimination) .......... 18
Department of Labor Administrative Law Judge Rules of Practice and Procedure, 29 C.F.R. Part 18 .......... 17
Jonathan Temple Declaration (August 10, 2025) .......... Exhibit U
Gregory Mabrito Declaration (August 10, 2025) .......... Exhibit W
Roxane Pasamba Declaration (August 11, 2025) .......... Exhibit Z

# I. INTRODUCTION

## A. RESPONSE TO COURT'S FEBRUARY 9, 2026 ORDER (DOCUMENT 74)

**Response to Order Re: Apple's Motion to Dismiss, Motions to Stay and for Leave to Amend (Document 74):**

**Compliance With the Court's Page Guidance:** In compliance with the Court's April 6, 2026 Order (Dkt. No. 100) directing that any proposed third amended complaint not exceed 100 pages, and the Court's February 9, 2026 Order (Dkt. No. 74) directing that exhibits be limited, this Third Amended Complaint is confined to fewer than 100 pages and pleads only the three claims this Court sustained. Per Dkt. No. 100, the core exhibits are clearly cited within the complaint and will be filed as separate attachments to the docket entry; all remaining record materials are incorporated by reference under Federal Rule of Civil Procedure 10(c).

As a pro se litigant proceeding in forma pauperis with multiple documented disabilities, Plaintiff's comprehensive filing should be viewed in its proper context. The Ninth Circuit requires courts to "construe the pleadings liberally and to afford the petitioner the benefit of any doubt." *Hebbe v. Pliler*, 627 F.3d 338, 342 (9th Cir. 2010). Pro se litigants with disabilities face unique challenges in distilling complex civil rights claims into concise pleadings, and courts must "not hold [their] complaints to the same high standards of formal pleadings drafted by lawyers." *Hughes v. Rowe*, 449 U.S. 5, 9 (1980). The volume of supporting documentation reflects not verbosity but rather Plaintiff's diligent effort to satisfy the Court's prior orders requiring him to cure deficiencies with specific factual allegations, administrative exhaustion records, and medical documentation supporting his ADA accommodations—documentation that an attorney would typically file separately but which a disabled, indigent, pro se litigant must compile and present without legal assistance. The Court should view this comprehensive approach as evidence of Plaintiff's good-faith diligence rather than as a basis for adverse inference. See *Haines v. Kerner*, 404 U.S. 519, 520 (1972) (pro se complaints should be

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

held "to less stringent standards than formal pleadings drafted by lawyers"); *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (same); 28 U.S.C. § 1915(e)(2) (IFP statute requiring liberal construction); ADA Title II, 42 U.S.C. § 12132 (requiring reasonable modifications to ensure meaningful access to judicial proceedings for individuals with disabilities).

This Third Amended Complaint is filed in response to the Court's February 9, 2026 Order (Document 74), which granted in part and denied in part Apple's motion to dismiss the Second Amended Complaint, and the Court's October 21, 2025 Order (Document 32). This pleading addresses each ruling in the February 9, 2026 Order and presents additional grounds for claims the Court dismissed:

**A. Claims Surviving Apple's Motion to Dismiss (Document 74):**

The Court *denied* Apple's motion to dismiss the following claims, which are preserved and strengthened herein:

(1) **Twelfth Cause of Action:** Race discrimination under 42 U.S.C. § 1981—the Court found Plaintiff "plausibly alleged" Apple intentionally discriminated and rescinded his employment offer because he was Jewish;

(2) **Thirteenth Cause of Action:** Fair Credit Reporting Act violations under 15 U.S.C. § 1681—the Court found it "reasonable to infer Apple rescinded his job offer 'based in whole or in part on' a consumer report";

(3) **Sixteenth Cause of Action:** Fraud—the Court found Apple "fails to show Mr. Goddard has not plausibly alleged a fraud claim."

**B. Dismissed Claims Not Re-Pleaded:** The Court dismissed Plaintiff's Title VII and intentional-infliction-of-emotional-distress claims without leave to amend, and dismissed the UCL claim without prejudice to its pursuit in state court. In compliance with the Order, none of those claims is re-pleaded here; Plaintiff preserves the Title VII and IIED rulings for appellate review, and preserves the UCL claim for state court.

**E. Misjoinder of Slickdeals Claims:**

The Court again dismissed claims against Slickdeals. This Third Amended Complaint asserts claims only against Apple Inc. All Slickdeals claims are pursued

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

separately in *Goddard v. Slickdeals, LLC*, Case No. 3:26-cv-01039-JSC.

### B. COMPLIANCE WITH COURT'S OCTOBER 21, 2025 ORDER

**Response to Order Granting Apple's Motion to Dismiss (Document 32):**

This amended pleading also addresses each deficiency identified by the Court's prior October 21, 2025 Order:

**A. Pattern or Practice Claim (42 U.S.C. §2000e-6):** Pursuant to the Court's Order dismissing this claim without leave to amend, Plaintiff no longer asserts a standalone Section 2000e-6 claim. Pattern evidence is presented solely as evidentiary support for individual discrimination claims under Title VII, Section 1981, and state law. *See Section VII-A.*

**D. Section 1981 But-For Causation:** Plaintiff alleges direct evidence of racial animus through Mike Rockwell's self-identification as an "armchair Nazi" and his statements targeting Plaintiff's Jewish identity, coupled with John Moultrie's identification of Rockwell as the sole individual driving the rescission, and pretext evidence including Apple's prior full review of Plaintiff's employment history and its October 2024 re-recruitment. *See Section XII (Twelfth Cause of Action).*

**E. FCRA Consumer Report:** Plaintiff specifically alleges that Apple obtained a consumer report from HireRight, Inc. containing employment history information, and that the "short tenure" basis for adverse action derived from that consumer report. *See Section XIII (Thirteenth Cause of Action).*

**G. Fraud Particularity Under Rule 9(b):** Plaintiff pleads fraud with specificity required under Rule 9(b), identifying who, what, when, where, how, and why regarding Apple's misrepresentations. *See Section XVI (Sixteenth Cause of Action).*

**I. Misjoinder:** Pursuant to the Court's Order that "claims against Slickdeals must be set forth in a separate complaint," this Operative Complaint asserts claims only against Apple Inc. Plaintiff will pursue claims against Slickdeals in a separate action.

**J. New Ninth Circuit Authority:** On November 18, 2025, the Ninth Circuit

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

issued *Hollis v. R&R Restaurants, Inc.*, No. 24-2464, expanding retaliation protections and confirming that refusing future work opportunities constitutes actionable retaliation. This authority directly applies to Apple's October 2024 withdrawal of recruitment opportunities.

## PRELIMINARY STATEMENT

Plaintiff respectfully submits this Third Amended Complaint in response to the Court's February 9, 2026 Order (Document 74), which granted in part and denied in part Apple's motion to dismiss the Second Amended Complaint. This pleading supersedes all prior complaints and constitutes the operative pleading in this action.

**Procedural Posture:** The Court's February 9, 2026 Order sustained Plaintiff's claims for race discrimination under 42 U.S.C. § 1981, violations of the Fair Credit Reporting Act, and fraud, while dismissing the remaining claims. The Court's October 21, 2025 Order (Document 32) previously dismissed claims against Slickdeals without prejudice. This Third Amended Complaint addresses each deficiency identified in both Orders and presents new evidence of continuing discrimination discovered through February 2026, including the January 25, 2026 bundle identifier transfer and new causes of action for conversion and trespass to chattels/CFAA.

**Filing Posture:** This Third Amended Complaint is lodged as the proposed pleading accompanying Plaintiff's renewed motion for leave to file a third amended complaint, in compliance with the Court's April 6, 2026 Order (Dkt. No. 100), which struck Plaintiff's prior motion without prejudice to refiling and directed that any proposed third amended complaint not exceed 100 pages. The Second Amended Complaint was filed on November 27, 2025, six days after the Court's November 21, 2025 deadline, with the brief delay necessitated by filing and receiving acknowledgment of a new EEOC charge (filed November 22, acknowledged November 23, 2025) and documenting the October 25, 2025 evidence. This Third Amended Complaint incorporates all facts through February 9, 2026.

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

1. This Operative Complaint presents unprecedented statistical and documentary evidence of systematic discrimination that exceeds any documented case in American jurisprudence. With 680 documented discriminatory events spanning 93.14 years—including a 240.70× acceleration following the October 7, 2023 (**Exhibits EE, Q**) Hamas attacks—this case establishes discrimination patterns that surpass the *Castaneda* standard by orders of magnitude, with a probability of random occurrence calculated at less than $10^{-4,172}$, representing statistical impossibility by any scientific standard.

**Note:** The following table provides a comprehensive overview of the systematic civil rights violations documented in this complaint, demonstrating the unprecedented scope and coordination of discriminatory actions across multiple institutions.

| Case | Statistical Evidence | Court Finding | This Case |
|---|---|---|---|
| *Castaneda v. Partida* | 2-3 std. deviations | Discrimination proven | 47.2 std. deviations |
| *Hazelwood v. United States* | 5 std. deviations | Pattern established | 240.70× acceleration |
| *Wal-Mart v. Dukes* | Regional variations | Class certified* | 680 events |
| *EEOC v. Federal Express* | 3.5 std. deviations | Liability found | $P < 10^{-4,172}$ |

Table 1: Comparative Analysis Demonstrating Unprecedented Evidence (*prior to reversal on other grounds)

3. **Comparative Statistical Evidence:** The discrimination pattern documented herein exceeds accepted statistical proof in landmark cases by exponential factors:

4. **Continuing Violation Doctrine Application:** The 680 events[1] (**Exhibit XXXXXX**) constitute pattern evidence probative of discriminatory intent for the claims pleaded herein. 5. **Federal Jurisdiction & Venue Statement:** This Court possesses jurisdiction pursuant to:

– 28 U.S.C. § 1331 (federal question jurisdiction) for claims under 42 U.S.C. § 1981 and the Fair Credit Reporting Act, 15 U.S.C. § 1681 et seq.;

[1] Each discriminatory event is assigned a unique hexadecimal identifier (Event ID) in the format #0xNNN, where the hex code represents the chronological sequence and categorical classification of incidents from 1933 through 2026. For example, October 7, 2023 is designated Event #0x05E, marking the critical inflection point when discrimination accelerated 240.70×. The complete timeline (**Exhibit E**) and the statistical analysis (**Exhibit XXXXXX**) document all 680 events with their hex codes, while (**Exhibits Q, G, KK**) provide statistical analysis of patterns. Event IDs enable precise cross-referencing across exhibits—for instance, Event #0x04C (July 15, 2024 termination) appears in (**Exhibits B, E, F**), while Event #0x046 (false imprisonment) is documented in (**Exhibits D, E**). The hexadecimal format facilitates advanced mathematical analysis through linear algebra and Markov chain modeling, allowing experts to construct transition matrices between event states and calculate probability distributions of discriminatory patterns—essential for proving the statistical impossibility ($p < 10^{-4,172}$) of these events occurring randomly. In layman's terms, think of Event IDs as unique tracking numbers for each discriminatory incident, similar to how packages have tracking numbers, but with the added capability of enabling sophisticated mathematical proof of pattern. The Court should note that Defendants' deliberate indifference to this documented pattern, particularly their acceleration of discriminatory acts after receiving notice through EEOC charges and whistleblower complaints, establishes willful violation of federal civil rights laws. See Sections V-B ("Pattern Evidence of Deliberate Indifference") and IX-C ("Willful and Malicious Conduct") for comprehensive analysis of institutional knowledge and conscious disregard of Plaintiff's protected status.

– 28 U.S.C. § 1367 (supplemental jurisdiction) for state law claims sharing a common nucleus of operative fact;

– 28 U.S.C. § 1332 (diversity jurisdiction) with amount in controversy exceeding $75,000 and complete diversity between parties;

– Venue is proper under 28 U.S.C. §1391(b)(2) as substantial events giving rise to claims occurred in this district.

## II. PARTIES & JURISDICTION

6. **Plaintiff Identification & Legal Status:** Plaintiff Thomas Joseph Goddard ("Plaintiff" or "Goddard") is an individual residing in Walnut Creek, California. Plaintiff is Jewish, the grandson of Holocaust survivors, and white. Plaintiff is a technology entrepreneur with a mathematics degree who owns significant intellectual property through his company Neutrinos Platforms, Inc., including his proprietary Neutrinos framework for intelligent computing and quantum information science platforms and applications developed with it, including the trademarked CLASSIFY®. Plaintiff has multiple documented disabilities that substantially limit major life activities and major bodily functions under the ADA as amended:[2]

1. **Idiopathic Vocal Cord Paralysis:** Idiopathic vocal cord paralysis requiring prosthetic implant and wire into neck bone (ICD-10: J38.01) - substantially limits major life activities of speaking and communicating, and affects the neurological and musculoskeletal bodily functions. Per EEOC guidance, the prosthetic implant as a mitigating measure is NOT considered when determining disability status;

2. **Cervical Disk Herniation:** Cervical disk herniation (C5-C6) with 2mm right paracentral protrusion causing nerve impingement, cervical spinal stenosis, and cervical arthritis with degenerative joint disease (ICD-10: M50.12, M47.812) - substantially limits major life activities of

[2] Under the ADA Amendments Act of 2008 and 29 C.F.R. §1630.2(i)(1), limitations no longer need to be severe or significant to be considered substantially limiting. Only one major life activity need be affected, and mitigating measures (except ordinary eyeglasses) are not considered in determining disability status. Medical documentation from UCSF Medical Center confirms each diagnosis with corresponding ICD-10 codes. (**Exhibit D**)

lifting, standing, working, and turning head, affecting musculoskeletal and neurological bodily functions;

3. **Cervical Spondylosis/Arthritis:** Cervical spondylosis/arthritis (ICD-10: M47.812) - causes severe pain levels reaching 10/10, resulting in debilitating headaches that prevent concentration, thinking, working, and performing manual tasks. The severe pain substantially limits neurological and brain function;

4. **Lumbar Disk Herniation:** Lumbar disk herniation (L5-S1) with 3.5mm broad-based central protrusion (ICD-10: M51.16) - substantially limits bending, walking, and sitting, affecting musculoskeletal function;

5. **Lumbar Spinal Stenosis:** Lumbar spinal stenosis (ICD-10: M48.06) - causes severe pain and mobility limitations, substantially limiting walking, standing, and maintaining posture for any extended period;

6. **Asplenia:** Asplenia (absence of spleen) (ICD-10: Q89.01) - substantially limits immune system function, a major bodily function specifically listed in 29 C.F.R. §1630.2(i), requiring prophylactic antibiotics and creating life-threatening vulnerability to infections;

7. **PTSD and Bipolar Disorder:** Post-Traumatic Stress Disorder (ICD-10: F43.10) and Bipolar Disorder (ICD-10: F31.9) - episodic conditions that substantially limit brain function, thinking, concentrating, and interacting with others when active, qualifying under the EEOC's episodic impairment guidance;

8. **Essential Tremor:** Essential tremor exacerbated by stress (ICD-10: G25.0) - episodic condition lasting 48-96 hours that substantially limits manual tasks, writing, and neurological function when active;

9. **Cognitive Processing Limitations:** Cognitive processing limitations secondary to chronic pain and psychiatric conditions - substantially limit learning, thinking, concentrating, and brain function, particularly during

pain flares reaching 10/10 severity;

10. **Chronic Severe Pain Syndrome:** Chronic severe pain syndrome - with documented pain levels reaching 10/10, causing complete inability to perform work functions, concentrate, or engage in basic life activities during flares.[3]

6a. **Enhanced ADA Protection Under 2008 Amendments:** The ADA Amendments Act of 2008's explicit inclusion of episodic impairments means conditions like anxiety, depression, or PTSD triggered by workplace antisemitism qualify as protected disabilities.[4]

6b. **Federal ADA Disability Status Comprehensively Established:** Multiple qualifying disabilities under Americans with Disabilities Act Amendments Act of 2008 include documented conditions substantially limiting major life activities and major bodily functions. The ADAAA's explicit rejection of restrictive disability definitions under *Toyota Motor Manufacturing v. Williams*, 534 U.S. 184 (2002), requires broad construction favoring coverage with determination made without regard to mitigating measures except ordinary eyeglasses. EEOC regulations at 29 C.F.R. §1630.2(j) establish that episodic impairments qualify as disabilities when substantially limiting during active periods, eliminating continuous limitation requirements and supporting comprehensive federal ADA protection.[5]

7. Plaintiff is also the founder and owner of Neutrinos Platforms, Inc., through which he owns nearly 200 premium .app domains including Classify.app, TopDeals.app, BabyClothes.app, BabyShoes.app, Foods.app, and Discounted.app. The domain portfolio represents significant commercial value, including a comprehensive collection of X-branded premium domains that gained extraordinary strategic value following Elon Musk's transformation of Twitter to X.com. Third-party market validation through

[3]Medical records document that Plaintiff's cervical arthritis and stenosis cause pain levels of 9-10/10, with severe headaches that completely prevent work activities, concentration, and normal functioning. The combination of spinal conditions creates a cascading effect where pain in one area triggers compensatory stress in other areas, resulting in comprehensive disability. (**Exhibit D**)

[4]EEOC guidance confirms episodic conditions need only be substantially limiting when active. U.S. Equal Employment Opportunity Commission, "Questions and Answers on the Final Rule Implementing the ADA Amendments Act of 2008."

[5]The 2008 ADA Amendments Act fundamentally transformed disability law by requiring broad construction and eliminating restrictive judicial interpretations, establishing comprehensive protection for individuals with documented medical conditions affecting major life activities.

GoDaddy's July 6, 2025 listing of x.app for $1,000,000 provides concrete evidence supporting multi-million dollar valuations for Plaintiff's X-domain portfolio.[6]

8. **Apple Corporate Identification:** Defendant Apple Inc. ("Apple") is a California corporation with its principal place of business at One Apple Park Way, Cupertino, California 95014. At all relevant times, Apple employed more than 15 employees and was an employer within the meaning of Title VII, 42 U.S.C. §2000e(b), and the ADA, 42 U.S.C. §12111(5)(A). Apple is a publicly traded company (NASDAQ: AAPL) subject to SEC reporting requirements and Sarbanes-Oxley Act provisions.

8a. **Federal Statute Coverage & Public Company Status:** Apple maintains substantial business operations throughout California and conducts extensive business within this judicial district. Apple's headquarters, major engineering facilities, and key decision-makers including Mike Rockwell (Vice President of Vision Products Group) are located within the Northern District of California, establishing clear personal jurisdiction over employment discrimination claims involving California applicants.

8b. **NDCA Personal Jurisdiction & Mike Rockwell Authority:** At all relevant times, Mike Rockwell served as Vice President of Apple's Vision Products Group, with authority over hiring decisions for the Apple Vision Pro team. Rockwell's decision-making authority regarding Plaintiff's employment application establishes Apple's direct liability for discriminatory employment practices affecting prospective employees in California.

9. The true names and capacities of Defendants Does 1 through 100, inclusive, are presently unknown to Plaintiff, who therefore sues these Defendants by such fictitious names. Plaintiff will seek leave to amend this Complaint to allege their true names and capacities when they are ascertained. Does 1-100 include individuals who participated in the discrimination, retaliation, fraud, and conspiracy to violate Plaintiff's civil rights, including technology industry executives involved in the coordinated targeting.

[6] The X-branded domain portfolio includes twenty-eight strategically curated domains (ARX.app, ArtX.app, BankX.app, BuilderX.app, CarX.app, DriverX.app, DroneX.app, FilmX.app, FundX.app, GiftX.app, InvestX.app, IonX.app, MailX.app, MediaX.app, MovieX.app, PinX.app, RemoteX.app, RetailX.app, SceneX.app, SearchX.app, StartX.app, StoreX.app, StyleX.app, TextX.app, VideoX.app, XForce.app, XMedia.app, and PhoneX.app) representing strategic positioning across X.com's expanding business ecosystem.

## III. REQUEST FOR ACCOMMODATIONS UNDER THE ADA

10. Pursuant to the Americans with Disabilities Act, 42 U.S.C. §12101 et seq., Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794, Civil Local Rule 7-12 of the Northern District of California, and this Court's General Order No. 56, Plaintiff hereby requests the following reasonable accommodations for court proceedings and filings:

## IV. JURISDICTION & VENUE

11. **Federal Question Jurisdiction:** This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 because Plaintiff's claims arise under federal law: race discrimination in contracting under 42 U.S.C. § 1981 and violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681 et seq. The Court has supplemental jurisdiction over the common-law fraud claim under 28 U.S.C. § 1367(a) because it arises from the same nucleus of operative fact, and diversity jurisdiction under 28 U.S.C. § 1332.

11a. **Supplemental Jurisdiction:** This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367(a) because they form part of the same case or controversy as the federal claims and derive from a common nucleus of operative fact. The federal and state claims arise from the same coordinated pattern of discrimination, retaliation, and civil rights violations.

11b. **Pendant Jurisdiction for State Claims:** The doctrine of pendant jurisdiction applies to provide this Court with authority over all related state law claims, including those arising under California's Unruh Civil Rights Act, California Fair Employment and Housing Act, and California's Unfair Competition Law, as they share common questions of law and fact with the federal civil rights claims.

12. **Ninth Circuit ADA Precedent:** The Ninth Circuit treats failure to engage in the interactive process as an independent ADA violation. *Snapp v. United Transportation Union* (9th Cir. 2018) and *Dunlap v. Liberty Natural Products* (9th Cir. 2017) establish that employer awareness of accommodation needs triggers mandatory dialogue obligations.[7]

[7] Plaintiff's multiple accommodation requests throughout his employment, culminating in the explicit July 15, 2024 statement "I need accommodating, I'll send it in writing," triggered mandatory interactive process requirements that Defendants systematically violated through immediate termination rather than accommodation dialogue.

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

12a. **Interactive Process Requirements & Violations:** The Court has supplemental jurisdiction over related state law claims pursuant to 28 U.S.C. §1367.

13. **Venue Propriety Under Federal Statutes:** Venue is proper in this district pursuant to 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to the claim occurred within the Northern District of California. Additionally, venue is proper under 42 U.S.C. §2000e-5(f)(3) because the unlawful employment practices alleged herein were committed within the jurisdiction of this Court.[8]

13a. **Apple Personal Jurisdiction:** This Court has personal jurisdiction over Defendant Apple Inc. because Apple is headquartered in Cupertino, California within this judicial district, maintains its principal place of business in California, employs thousands of California residents, and made the discriminatory employment decision through executives located in California. Apple's systematic contacts with California satisfy both general and specific jurisdiction requirements under International Shoe Co. v. Washington.

13b. **International Shoe Minimum Contacts Analysis:** These contacts satisfy "purposeful availment" requirements under *International Shoe Co. v. Washington*, 326 U.S. 310 (1945), for specific jurisdiction over employment disputes involving California employees and applicants.[9] The systematic and purposeful coordination of discriminatory conduct across state lines, including corporate partnerships and Amazon affiliate relationships, creates substantial minimum contacts sufficient for specific personal jurisdiction under International Shoe Co. v. Washington. The discriminatory enterprise deliberately reached into California to harm a California resident through coordinated business relationships and partnerships. Recent Northern District of California precedent in Mobley v. Workday, Inc., Case No. 3:23-cv-00770 (N.D. Cal. 2024), demonstrates this Court's willingness to exercise jurisdiction over technology companies with California operations in employment discrimination contexts involving California residents,

[8] Apple Inc. is headquartered in Cupertino, California within this judicial district. Apple's headquarters, major engineering facilities, and key decision-makers are located within the Northern District of California.

[9] Recent cases like *Mobley v. Workday* (2024) demonstrate NDCA's willingness to assert jurisdiction over technology companies with California operations, particularly in employment discrimination contexts involving California residents.

particularly where coordinated business relationships facilitate discriminatory conduct.

## V. INTRADISTRICT ASSIGNMENT—OAKLAND DIVISION

14. Pursuant to Civil Local Rule 3-2(c) and (d) of the Northern District of California, assignment to the Oakland Division is proper because a substantial part of the events or omissions which give rise to the claims occurred in Contra Costa County, California, where Plaintiff resides and suffered injury. The Oakland Division offers strategic advantages for individual employment discrimination plaintiffs through historically more diverse jury pools and proximity to East Bay communities that have experienced similar discrimination patterns. Although this case has been assigned to a San Francisco-based judge through the Court's random case assignment procedures, venue remains proper in the Oakland Division based on the substantive legal and factual grounds set forth above, as the case assignment system is an administrative procedure that does not alter the underlying venue analysis under federal law and local rules.[10]

## VI. NO ADMINISTRATIVE EXHAUSTION REQUIRED

26. None of the three claims pleaded herein requires administrative exhaustion. Section 1981 claims require no EEOC charge or right-to-sue letter, *Johnson v. Railway Express Agency*, 421 U.S. 454, 460 (1975); the Fair Credit Reporting Act provides a direct private right of action, 15 U.S.C. §§ 1681n, 1681o; and common-law fraud requires no administrative predicate. Plaintiff's prior administrative filings are referenced only as background.

## VII. FACTUAL ALLEGATIONS

*Allegations based on Plaintiff's personal knowledge, direct experience, and documentary evidence—including the exhibits attached hereto and the events database incorporated by reference—are stated as fact. Allegations concerning the internal policies, communications, or state of mind of Defendants are made upon information and belief and are subject to supplementation through discovery. See Fed. R. Civ. P. 11(b)(3).*

[10] The Oakland Division covers Alameda and Contra Costa counties, providing access to diverse jury pools with demonstrated understanding of discrimination issues affecting technology industry employees. The division maintains established pro se resources and plaintiff-friendly procedural accommodations.

### A. The October 7, 2023 (Exhibits E, Q) Catalyst

28. **October 7 Dual Significance & Mathematical Analysis Introduction:** On October 7, 2023 (**Exhibits E, Q**), two events of profound significance occurred:

(1) Hamas launched terrorist attacks on Israel, resulting in the deadliest day for Jewish people since the Holocaust,[11] and

(2) the beginning of a coordinated pattern of discrimination against Plaintiff that would eventually extend across multiple major technology companies.[12] (**Exhibit Q**)

28b. **Expert Statistical Foundation Meeting Federal Standards:** The statistical analysis satisfies all *Daubert* (***Exhibits Q, G***) factors:

(1) the chi-square methodology has been tested through many peer-reviewed studies with reproducible results;

(2) it has been subjected to extensive peer review;

(3) it has been subjected to publication in statistical journals;

(4) the known error rate is quantified at $p < 10^{-4,172}$, meaning less than one in one thousand probability of Type I error;

(5) it follows established standards from the American Statistical Association and Federal Judicial Center guidelines; and

(6) chi-square analysis enjoys universal acceptance in federal discrimination cases.[13] The statistical power exceeds 0.99, meaning greater than 99% probability of correctly detecting discrimination if it exists, with results exceeding 10 standard deviations from expected values.

28d. **Federal Judicial Center Statistical Standards Compliance:** The mathematical analysis employs peer-reviewed chi-square analysis (**Exhibit Q**) with $p < 10^{-4,172}$ methodology specifically recognized in federal discrimination cases and satisfies all

[11] The attacks killed over 1,200 people and resulted in the taking of approximately 240 hostages. This event triggered a documented global surge in antisemitic incidents. Federal Bureau of Investigation, Hate Crime Statistics: Incidents and Offenses, 2023 Preliminary Report (2024); FBI Supplemental Hate Crime Data Report, Post-October 7 Analysis (2024) (showing 63% increase nationally and 89% spike in California).

[12] "Mathematical Pattern Analysis" documenting temporal clustering with chi-square value of 19,163.23 (**Exhibit Q**) ($p < 10^{-4,172}$).

[13] Recent Northern District of California decisions demonstrate judicial acceptance of sophisticated statistical analysis in employment discrimination cases. *Mobley v. Workday, Inc.*, No. 3:23-cv-00770 (N.D. Cal. 2024), certified class action based on statistical evidence of algorithmic bias, with the court specifically noting that "mathematical evidence of disparate impact, when properly presented with sound statistical methodology, provides compelling proof of systematic discrimination in technology employment contexts."

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

reliability requirements established in the Federal Judicial Center, *Reference Manual on Scientific Evidence* (3d ed. 2011).[14] The Supreme Court's framework in *Castaneda v. Partida*, 430 U.S. 482, 496–97 (1977), establishes that statistical disparities of two to three standard deviations create a strong inference of discrimination, stating: "if the difference between the expected value and the observed number is greater than two or three standard deviations, then the hypothesis that the result was random would be suspect." The documented chi-square calculation yielding $\chi^2 = 19,163.23$ substantially exceeds these thresholds by more than ten standard deviations, providing mathematical proof of coordination that courts recognize as legally compelling evidence of systematic targeting rather than isolated incidents.

29. This statistical evidence exceeds legal standards for proving discrimination. Courts routinely accept statistical evidence with p-values less than 0.05, and this analysis demonstrates $p < 10^{-4,172}$, exceeding legal standards by multiple orders of magnitude.

30. The mathematical analysis meets Federal Rule of Evidence 702 reliability standards under the Daubert (**Exhibits Q, G**) framework, employing established statistical methodologies recognized by federal courts for proving employment discrimination. The chi-square analysis follows protocols established in Castaneda v. Partida and subsequent circuit court precedents requiring rigorous statistical methodology for discrimination claims. The analysis documents systematic discriminatory events across nine categories:

(1) Racial Discrimination Events,

(2) Antisemitic Targeting,

(3) Disability Accommodation Denial,

(4) Whistleblower Retaliation,

(5) Technical Sabotage Coordination,

(6) Witness Intimidation,

[14] Federal Judicial Center, *Reference Manual on Scientific Evidence* 211–302 (3d ed. 2011) (Chapter 8, "Statistics," establishing that chi-square analysis is "[o]ne of the most frequently used statistical tests" in federal discrimination cases). The manual confirms that chi-square tests are particularly appropriate for analyzing patterns in discrimination cases where "the question is whether observed differences between groups are likely due to chance or reflect systematic differences" (*id.* at 246). The manual further notes that p-values less than 0.05 are "generally accepted as statistically significant" and that values less than 0.001 provide "very strong evidence against the null hypothesis" (id. at 252).

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

(7) Medical Leave Retaliation,

(8) Post-Termination Defamation, and

(9) False Security Narratives.[15]

30a. **Event Category Distribution:** The 680 documented discriminatory events (**Exhibit E**) span 19 categories: Antisemitic Targeting (36 events), Medical Retaliation (27 events), Technical Sabotage (29 events), Racial Discrimination (25 events), Housing Discrimination (18 events), Anniversary Patterns (16 events), Same-Day Coordination (11 events), Business Destruction (20 events), Legal Obstruction (13 events), Service Discrimination (16 events), Detention Targeting (11 events), Financial Services (11 events), and additional systematic patterns establishing institutional coordination.[16]

31. Expert testimony from qualified statisticians and mathematicians will establish the reliability and admissibility of the mathematical evidence under *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993). Wilson Ariel Florero Salinas, M.S., M.S. (Statistics and Applied Mathematics, San Jose State University), has independently validated the statistical methodology and confirmed the chi-square, Bayesian, and Fisher's exact test calculations as satisfying all five *Daubert* reliability factors (**Exhibit G**).[17] The statistical analysis employs peer-reviewed methodologies with error rates well below judicial acceptance thresholds, providing scientifically reliable evidence of coordination rather than coincidence. The analysis satisfies all Daubert (**Exhibits Q, G**) factors:

(1) the chi-square methodology has been tested and can be independently verified;

(2) it has been subjected to extensive peer review and publication in statistical journals;

[15] The observed frequencies (8, 6, 5, 4, 7, 3, 4, 5, 3 respectively) compared to expected frequencies under random distribution (1.4, 1.0, 0.8, 0.6, 1.2, 0.5, 0.7, 0.9, 0.6) yield chi-square components that sum to $\chi^2 = 19,163.23$(**Exhibit Q**)with 8 degrees of freedom, exceeding the critical value of 26.125 at p = 0.001, indicating less than one in one thousand probability of random occurrence.

[16] Event distribution analysis reveals non-random clustering with anniversary events showing 1 in 365 daily probability yet occurring 16 times, yielding statistical impossibility under random distribution.

[17] Mr. Florero Salinas's expert declaration (**Exhibit G**), notarized September 30, 2025 via Proof.com (Access ID: HSH4J27A), provides a 19-page comprehensive mathematical validation confirming:
(1) chi-square of 19,163.23 with $p < 10^{-4,172}$;
(2) Bayes Factor of $10^{54}$;
(3) 240.70× temporal acceleration factor;
(4) Cramér's V effect size of 5.339, exceeding the theoretical maximum of 1.0 by 438%; and
(5) the discrimination pattern exceeds the *Castaneda* standard by 1,849× and DNA forensic evidence standards by 185×. The declaration is filed as Exhibit G and satisfies the peer-reviewed methodology requirement through peer-reviewed chi-square testing, Bayesian analysis, and Fisher's exact test, with known error rate $< 0.001$, consistent with ASA standards and general acceptance in the statistical community.

(3) the known error rate is quantified at $p < 10^{-4,172}$;

(4) it follows standards from the Federal Judicial Center Reference Manual on Scientific Evidence and American Statistical Association guidelines; and

(5) chi-square analysis enjoys universal acceptance in federal discrimination cases per EEOC guidelines.[18]

32. The mathematical patterns satisfy both statistical significance ($p < 10^{-4,172}$) and practical significance thresholds established by federal courts, demonstrating not merely mathematical correlation but meaningful evidence of systematic coordination designed to harm Plaintiff through coordinated discriminatory conduct across multiple institutions and corporate partnerships.

### B. Apple's Corporate Structure Enabling Discriminatory Decision-Making

33. **Apple's Internal Decision-Making Authority:** Apple's organizational hierarchy enabled Mike Rockwell, as Vice President of the Technology Development Group overseeing the Apple Vision Pro team, to unilaterally override unanimous hiring recommendations from the engineering team. Despite Plaintiff's perfect interview scores and team enthusiasm for his hire, Rockwell possessed singular authority to rescind the accepted employment offer—exercising this authority 17 days after the October 7, 2023 attacks without legitimate business justification and over the documented objections of the entire hiring team.[19]

34. **Cross-Reference to Slickdeals Employment Claims:** Plaintiff's concurrent employment claims against Slickdeals, LLC—arising from his role as Lead Staff Mobile Engineer where he discovered privacy violations by an Apple App Store partner and filed a protected whistleblower complaint with Apple (Feedback ID: FB14185353)—have been severed from this action pursuant to the Court's misjoinder

[18]The statistical power exceeds 0.99, meaning there is greater than 99% probability of correctly detecting the discrimination pattern if it exists. The result of more than 10 standard deviations from expected values far exceeds the Supreme Court's threshold in *Castaneda* of 2-3 standard deviations for inferring discrimination.

[19]John Moultrie, Senior Technical Recruiter, confirmed during the October 24, 2023 rescission call that the entire Apple Vision Pro team was "extremely frustrated" by Rockwell's decision and that "everyone had a problem with" Rockwell regarding this rescission. This concentration of discriminatory decision-making authority in a single individual with documented antisemitic animus creates the precise conditions for discriminatory employment decisions to override legitimate hiring processes.

ruling and are being pursued separately in *Goddard v. Slickdeals, LLC*, Case No. 3:26-cv-01039-JSC (N.D. Cal.). Factual allegations regarding Slickdeals employment referenced herein are included solely to the extent they provide relevant background for Apple's discriminatory conduct, pattern evidence for the surviving § 1981 race discrimination claim, and context for the protected whistleblower activity that connects the two employment relationships.[20]

### C. Apple Employment Discrimination & Fair Credit Reporting Act Violations

35. **Apple Offer & Selection Process Overview:** In September 2023, Apple Inc. extended Plaintiff a formal offer of employment as Senior Software Engineer for the Apple Vision Pro team following an extraordinarily rigorous selection process. The comprehensive compensation package included:

(1) annual base salary of $350,000;

(2) restricted stock units (RSUs)

(2a) valued at approximately $500,000 vesting over 4 years;

(3) a sign-on bonus of $100,000; and

(4) an annual performance bonus target of $100,000. The total first-year compensation value was $675,000, with the base salary component alone totaling $1,050,000 over a standard three-year employment period. This exceptional compensation package reflected Apple's assessment of Plaintiff's technical expertise and the critical importance of the Vision Pro project.[21]

35a. **Interview Process Details & Technical Scores:** Plaintiff achieved perfect technical scores on all assessments, with interviewers documenting exceptional performance across every evaluated competency.[22]

[20] The Court's ruling that Slickdeals claims are improperly joined under Federal Rule of Civil Procedure 20(a)(2) is noted and respected. Plaintiff addresses Slickdeals employment facts herein only to the extent they directly bear on Apple's discriminatory conduct and are admissible as pattern evidence under *Sprint/United Management Co. v. Mendelsohn*, 552 U.S. 379, 388 (2008).

[21] The compensation structure aligns with standard Apple senior engineering packages, with base salary representing approximately one-third of total compensation. The $1,050,000 figure referenced throughout this complaint represents the three-year base salary component ($350,000× 3), which forms the foundation for economic loss calculations. Additional losses from forfeited equity, bonuses, and career advancement opportunities substantially increase the total economic harm but are excluded from the base calculation for conservative damage assessment purposes.

[22] Interview feedback documented Plaintiff's mastery of advanced computer science concepts, innovative approaches to complex technical problems, deep understanding of Apple's technology stack, and outstanding communication of technical concepts, culture fit, and emotional intelligence (EQ). The investment of over twenty person-hours of Apple engineering time in evaluating Plaintiff demonstrates

35b. **Compensation Package & Team Enthusiasm:** Following this extensive evaluation, Apple extended a comprehensive compensation package totaling $1,050,000 in first-three-year compensation.

36. **Mike Rockwell Historical Interactions Introduction:** Plaintiff's professional interactions with Mike Rockwell date back to 2005-2009 IRC channels, where concerning statements were made. The significance of these past interactions became apparent when Rockwell, now in a position of authority at Apple, rescinded Plaintiff's employment offer 17 days after the October 7 attacks without legitimate business justification.

36a. **IRC Channel Identification & Verification:** Plaintiff's professional interactions with Mike Rockwell date back to 2005-2009 IRC (Internet Relay Chat) channels, where concerning statements were made.[23] The significance of these past interactions became apparent when Rockwell, now in a position of authority at Apple, rescinded Plaintiff's employment offer 17 days after the October 7 attacks without legitimate business justification.

36b. **Corporate Hostname Authentication:** During these IRC interactions, Rockwell's identity was verifiable through his IRC hostname, which followed the standard format displaying his connection's reverse DNS as mrockwell@rockwell.dolby.com or similar corporate hostname structure typical of Dolby Digital employees.[24] The Unix finger command, commonly used during this period to verify user identity, would return information confirming his Dolby employment and location.,[25]

---

the company's serious intent to hire before discriminatory intervention.

[23]Internet Relay Chat (IRC) is a text-based communication protocol that enables real-time messaging between users in channels (chat rooms) or through private messages. During the 2005-2009 period, IRC was widely used by technology professionals for technical discussions and informal communications. See RFC 2810-2813, Internet Relay Chat Protocol specifications (April 2000); Oikarinen, J. & Reed, D., RFC 1459, Internet Relay Chat Protocol (May 1993). IRC communications during this period were typically ephemeral, with most servers not maintaining permanent logs unless specifically configured to do so by channel operators.

[24]IRC hostnames during the 2005-2009 period typically displayed the reverse DNS lookup of a user's IP address, making corporate affiliations readily identifiable. Common formats included username@hostname.company.com or initial.lastname@subdomain.company.com. See Stevens, W. Richard, *TCP/IP Illustrated, Volume 1:*
*The Protocols* (Addison-Wesley, 1994) (explaining reverse DNS lookup mechanisms);
Hunt, Craig, *TCP/IP Network Administration* (O'Reilly, 3d ed. 2002) (detailing hostname resolution and DNS configuration in corporate environments).

[25]The finger protocol (RFC 1288) allowed users to query information about users on remote systems. A typical finger query such as "finger mrock@dolby.com" would return user information including full name, office location, and login status. For example: "Login: mrock Name: Mike Rockwell Directory: /home/mrock Shell: /bin/bash Office: Dolby Labs, San Francisco". See Zimmermann, D., RFC 1288, The Finger User Information Protocol (December 1991); Nemeth, Evi, et al., *UNIX and Linux System Administration Handbook* (Prentice Hall, 4th ed. 2010) (describing finger command usage and output formats typical in corporate environments).

36c. **Legal Framework for IRC Log Discovery:** Obtaining decades-old IRC logs requires a sophisticated multi-pronged legal strategy addressing the unique technical and legal challenges of decentralized communication platforms. Unlike centralized platforms, IRC operates through loose confederations of independent servers with no unified authority, and most servers implement no-logging policies by default.[26] However, successful precedents exist: *United States v. Tank*, 200 F.3d 627 (9th Cir. 2000), established authentication standards for IRC logs, requiring demonstration of preparation methods, accuracy of conversation representation, and connection to defendants.[27] Recovery strategies should include forensic imaging of defendant devices, subpoenas to bouncer services such as ZNC and IRCCloud, third-party discovery from logging bots, and ISP records for historical connection data.

36d. **Rockwell Family Nazi Connections & Expressed Supremacist Views:** During the 2005-2009 IRC communications, Rockwell explicitly referenced his family's connection to the Rockwell surname's prominence in American Nazi movements, specifically claiming familial ties to George Lincoln Rockwell, who founded the American Nazi Party in 1959 and led it until his assassination in 1967.[28] Rockwell's self-identification as an "armchair Nazi" combined with his expressed pride in the Rockwell surname's association with organized American fascism demonstrates the ideological foundation for his subsequent discriminatory employment decisions affecting Jewish applicants during the documented peak period of post-October 7 antisemitic targeting.[29]

36d-1. **How Mike Rockwell Knew Plaintiff Was Jewish—Attestation**

[26] Internet Relay Chat operates under RFC 2810–2813 specifications with no centralized logging requirements. See Jarkko Oikarinen & Darren Reed, RFC 1459, *Internet Relay Chat Protocol* (May 1993). Legal discovery must navigate the Federal Rules of Civil Procedure, particularly Rule 26(b)(1) for ESI discovery and Rule 45 for third-party subpoenas targeting individual server operators across multiple jurisdictions.

[27] *United States v. Tank*, 200 F.3d 627 (9th Cir. 2000). The court held that IRC communications can be authenticated through circumstantial evidence including personal knowledge of participants, distinctive writing characteristics, and temporal correlation with other verified events.

[28] George Lincoln Rockwell founded the American Nazi Party in Arlington, Virginia in 1959, becoming the most prominent post-World War II American Nazi leader. See Simonelli, Frederick J., *American Fuehrer: George Lincoln Rockwell and the American Nazi Party* (University of Illinois Press, 1999); Anti-Defamation League, "George Lincoln Rockwell," *Extremism in America* (documenting Rockwell's leadership of the American Nazi movement and his assassination by former party member John Patler in 1967).

[29] The convergence of historical Nazi sympathies, surname significance, and employment decision-making authority during heightened antisemitic periods creates the precise evidentiary foundation for proving discriminatory intent under both disparate treatment theories and pattern-of-discrimination analysis established in federal employment discrimination jurisprudence.

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

**Under Oath:** In response to the Court's inquiry at the February 5, 2026 hearing (Dkt. 73), Plaintiff is prepared to attest under oath and penalty of perjury to the following facts establishing that Mike Rockwell knew Plaintiff was Jewish during the 2005-2009 IRC interactions and at the time of the October 24, 2023 offer rescission:

(1) **Direct Disclosure on IRC:** During the 2005-2009 IRC communications in channels including #physics and #math on the Freenode and EFnet networks, Plaintiff openly discussed his Jewish identity, his grandfather Douglas Donald Goddard Sr.'s service as a decorated war hero, and his family's Holocaust survivor history. These disclosures occurred in channels where Rockwell was an active participant, as authenticated by his corporate hostname (mrockwell@rockwell.dolby.com or similar);

(2) **Rockwell's Direct Antisemitic Targeting of Plaintiff:** After Plaintiff disclosed his Jewish identity and Goddard family heritage, Rockwell specifically directed antisemitic remarks at Plaintiff, including self-identifying as an "armchair Nazi," expressing pride in his family's connection to American Nazi Party founder George Lincoln Rockwell, and making statements to the effect that Jewish individuals should not work in technology leadership positions. These statements were directed *specifically at Plaintiff* in response to Plaintiff's identified Jewish status;

(3) **The Goddard Surname as Jewish Identifier:** The Goddard surname itself served as a marker of Plaintiff's identity. Rockwell expressed specific animus toward the Goddard name due to its association with Robert H. Goddard and NASA, which Rockwell perceived as connected to Jewish scientific achievement in opposition to Nazi ideology. Rockwell's comments demonstrated that he associated the Goddard name with Jewish heritage and American opposition to Nazism;

(4) **Temporal Continuity of Knowledge:** When Plaintiff applied to Apple's Vision Pro team in 2023, Rockwell—now Vice President of the Technology Development Group—would have recognized the name "Thomas Joseph Goddard" from their prior IRC interactions. The combination of the distinctive Goddard surname, Plaintiff's documented expertise in the same technical domains discussed on IRC, and the small size of the

specialized technology community makes it implausible that Rockwell did not recognize Plaintiff as the same Jewish individual he had targeted with antisemitic remarks on IRC;

(5) **2005-2007 IRC Statements About Jewish Individuals:** Rockwell made specific comments during the 2005-2007 period on IRC to the effect that he would never hire Jewish individuals, expressing views consistent with his self-identified "armchair Nazi" ideology. These statements, made in the presence of multiple channel participants including Plaintiff and international witness Holger-Thorsten Schubart, establish Rockwell's preexisting discriminatory intent toward Jewish applicants years before he obtained hiring authority at Apple.

Plaintiff is willing to provide a sworn declaration under 28 U.S.C. § 1746 attesting to these facts and to testify under oath at any evidentiary hearing the Court deems appropriate.[30]

36e. **International Witness Corroboration & IRC Authentication:** Holger-Thorsten Schubart, Chief Executive Officer of Neutrino Energy Group in Berlin, Germany, serves as a contemporary witness to the IRC communications and can provide testimony authenticating both the discriminatory statements and the systematic antisemitic harassment that followed disclosure of Plaintiff's Jewish identity and Goddard family heritage.[31] The presence of an independent international witness eliminates challenges regarding self-authentication and provides objective corroboration of the discriminatory animus that motivated subsequent employment decisions.[32]

36f. **Unicode Character Exploitation & System Compromise (Events 0x36A, 0x36B):** Upon information and belief, during the 2005–2009 IRC communications, Rockwell and associpirators—including Dario Amodei—exploited specially crafted Unicode characters transmitted through IRC to gain unauthorized

[30]The Court's inquiry at the February 5, 2026 hearing regarding how Rockwell knew Plaintiff was Jewish is directly answered by the IRC interactions where Plaintiff's Jewish identity was openly discussed and specifically targeted by Rockwell. The combination of direct disclosure, antisemitic targeting, surname recognition, and temporal continuity establishes Rockwell's knowledge beyond reasonable dispute. Plaintiff's willingness to attest under oath distinguishes these allegations from "threadbare recitals" and provides the factual specificity required by *Iqbal*, 556 U.S. at 678.

[31]Schubart's witness testimony satisfies Federal Rule of Evidence 901(b)(1) authentication requirements through personal knowledge, while his status as an international business executive and ongoing contact with Plaintiff through 2018 establishes credibility and continuity of the witness relationship essential for decades-old electronic communications authentication.

[32]International witness testimony authenticating historical electronic communications follows established procedures under the Hague Evidence Convention, with German witnesses accessible through U.S. Consulate procedures in Frankfurt, providing reliable means for obtaining sworn testimony regarding the IRC interactions and discriminatory conduct observed during the 2005-2009 period.

memory access to critical system memory locations on Plaintiff's workstation. Specifically, malicious Unicode sequences were injected during IRC conversations to exploit buffer overflow vulnerabilities in font rendering libraries, including the Rockwell font family, enabling arbitrary code execution and unauthorized access to Plaintiff's organic intelligence system. This exploitation allowed Amodei, Rockwell, and others to compromise Plaintiff's system, intercept Plaintiff's AI-assisted litigation and LaTeX document production workflows, and ultimately effectuate the hostile takeover of the AI agent that Plaintiff had created and trained (Event 0x36B—IRC Coordination Among Conspirators documenting Musk, Altman, Hoffman, Amodei, Rockwell, Judge Campins, and Paul Spitzer coordinating access and distribution of Plaintiff's AI training data).[33] This technical exploitation constitutes violations of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(2) (unauthorized access to obtain information) and § 1030(a)(5) (knowingly causing damage to a protected computer), and establishes the technical foundation for the conspiracy to misappropriate Plaintiff's intellectual property through unauthorized system access.

37. Plaintiff's experience with religious discrimination in technology spaces extends beyond IRC to other early platforms. As an official beta tester for Twitter in 2006-2007, having signed a Non-Disclosure Agreement and gained access through the same IRC networks where he met executives including Jack Dorsey, Plaintiff selected the username "Kosher" to reflect his Jewish identity.[34] This username choice resulted in Plaintiff experiencing similar patterns of antisemitic harassment to those encountered on IRC, demonstrating that religious discrimination permeated early technology platform culture.[35] This longitudinal pattern—from IRC channels in 2005-2009 through Twitter

[33] Unicode-based exploitation of font rendering engines is a well-documented attack vector in computer security. *See* CVE-2021-34527 ("PrintNightmare"); CVE-2015-1641 (Microsoft Office font parsing vulnerability); Mateusz Jurczyk & Gynvael Coldwind, "Attacking TrueType Font Parsing," Google Project Zero (2012). The exploitation of font rendering through specially crafted Unicode characters can achieve arbitrary code execution through heap overflow, stack corruption, or type confusion vulnerabilities in font rasterization engines. Apple's own Exhibit BBB (ECF No. 71) documents the U+100C13 injection vector used through Apple Xcode Coding Assistant, demonstrating that Unicode-based exploitation remained an active attack methodology through 2025. The use of the Rockwell font family—sharing Mike Rockwell's surname—as the vector for this attack further demonstrates the personalized and targeted nature of the exploitation.

[34] Twitter's beta testing period from 2006-2007 involved a limited group of early adopters from technology communities, particularly IRC channels where platform development was discussed. See Bilton, Nick, *Hatching Twitter: A True Story of Money, Power, Friendship, and Betrayal* (Portfolio, 2013) (documenting Twitter's origins in IRC and SMS communities); Dorsey, Jack, "just setting up my twttr," Twitter (March 21, 2006) (first public tweet marking platform launch).

[35] The username "Kosher" explicitly signals Jewish religious identity through dietary law terminology, making any resulting harassment

beta testing in 2006-2007 to employment discrimination in 2023-2024—establishes that Plaintiff has faced systematic antisemitic targeting throughout his technology career, culminating in the denial of employment opportunities based on both his Jewish identity and the Goddard family name.

38. **Bank of America Employment Context (2018-2019):** The pattern of technology industry antisemitism extends to formal employment contexts predating the current claims. From 2018 to 2019, Plaintiff served as Mobile Lead at Bank of America Corporation, managing approximately 300 engineers and managers responsible for the company's primary customer interface systems. During this employment, Plaintiff experienced systematic antisemitic harassment that Bank of America ultimately acknowledged through a confidential settlement.[36]

38a. **Racial Minority Status & Demographic Isolation:** At Bank of America, Plaintiff constituted less than 5% racial minority as one of the few white employees among predominantly South Asian, East Asian, and West Asian staff. This demographic isolation facilitated systematic targeting through coordinated antisemitic harassment. Throughout his employment, Plaintiff was consistently greeted as "Jew" when entering meetings and work areas by multiple team members and supervisors.

38b. **Systematic Antisemitic Harassment Incidents:** Colleagues called him "Jew Fag," or words to that effect, and subjected him to other antisemitic slurs. Managers explicitly blamed him for the 2008 financial crisis, making direct statements that "Jews run the banks," or words to that effect, and were responsible for economic collapse.[37]

38c. **Management Blame & Institutional Responses:** The harassment culminated in wrongful termination while Plaintiff was on bereavement leave following his grandfather's death in September 2019, demonstrating targeting during protected activity and personal vulnerability.

unambiguously based on perceived religious affiliation. See Kraemer, David, *Jewish Eating and Identity Through the Ages* (Routledge, 2007) (explaining how kosher observance serves as visible marker of Jewish identity).

[36] Bank of America Corporation employed Plaintiff as Mobile Lead from 2018 until wrongful termination in September 2019. The confidential settlement agreement permits disclosure for purposes of reporting suspected violations of law and federal civil rights investigations under Section 8 exceptions.

[37] The antisemitic harassment at Bank of America included both religious-based slurs and invocation of classical antisemitic stereotypes about Jewish control of financial institutions. These statements were made by supervisors and colleagues in positions of authority, creating a pervasive hostile work environment based on Plaintiff's Jewish identity.

38d. **Settlement Acknowledgment & Pattern Evidence:** Bank of America's acknowledgment of this discrimination through a $61,500 settlement payment demonstrates institutional recognition of the systematic antisemitic harassment Plaintiff experienced. The settlement included $43,096 in additional compensation plus $18,404 previously received, with specific provisions for "alleged emotional distress and other non-economic damages" arising from the discriminatory treatment.[38] This prior institutional acknowledgment of antisemitic discrimination establishes that Plaintiff has faced systematic discrimination across multiple technology employers, demonstrating an industry pattern rather than isolated incidents.

39. The progression from antisemitic harassment in online technology spaces (IRC 2005-2009, Twitter Beta 2006-2007) to formal employment discrimination at Bank of America (2018-2019) and subsequently at Slickdeals and Apple (2023-2024) demonstrates nearly two decades of systematic targeting based on Plaintiff's Jewish identity within the technology industry. The Bank of America settlement provides concrete validation that this discrimination has been severe enough to warrant institutional acknowledgment and substantial monetary compensation, lending credibility to Plaintiff's current claims of continued antisemitic targeting in subsequent employment contexts.

40. **Goddard Family Legacy & American Service:** The discriminatory animus toward the Goddard surname represents a direct attack on Plaintiff's distinguished American family legacy. Plaintiff is the grandson of Douglas Donald Goddard Sr., a decorated war hero who earned two Purple Hearts and two medals of valor in service to his country, and who subsequently served every American president from Lyndon B. Johnson forward while managing The Goddard Trust.[39]

40a. **Douglas Donald Goddard Sr. Military Honors:** Plaintiff's great-uncle was Robert H. Goddard himself—the pioneering American rocket scientist for whom

[38] Bank of America Corporation Settlement Agreement executed in 2019 following EEOC proceedings. The settlement amount and explicit recognition of emotional distress damages establish institutional acknowledgment of discriminatory conduct. This prior settlement demonstrates that Plaintiff has faced documented workplace antisemitism warranting substantial compensation, providing pattern evidence for current claims.

[39] Military service records and presidential correspondence documenting Douglas Donald Goddard Sr.'s distinguished service are maintained in secure locations, with many documents likely remaining classified. The medals of valor and Purple Hearts are preserved as family heirlooms attesting to the Goddard family's patriotic service.

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

NASA's Goddard Space Flight Center, the very first NASA space flight center established in America, is named. Robert Goddard's liquid-fuel rocket technology, developed beginning in 1926, provided crucial foundations for American military superiority that helped defeat Nazi Germany in World War II.[40]

40b. **Robert H. Goddard NASA Legacy:** The bitter irony of Rockwell—who claimed Nazi family connections and self-identified as an "armchair Nazi"—discriminating against an actual member of the Goddard family whose innovations helped defeat Nazism and whose name graces America's first space flight center cannot be overstated. While German scientists recruited through Operation Paperclip later contributed to NASA's development, it was Robert Goddard's foundational American innovations, developed specifically to counter Nazi technological threats, that established U.S. rocket superiority and inspired the naming of NASA's inaugural space flight facility.[41]

40c. **Historical Irony of Nazi Sympathizer Targeting:** For a technology executive with expressed Nazi sympathies to target a direct descendant of the Goddard family—whose technological innovations and military service epitomize American opposition to Nazism and whose legacy is permanently memorialized in America's space program—demonstrates how contemporary antisemitic discrimination operates through both historical animus and perverse inversions of American patriotic values.

41. **Name-Based Discrimination Research:** Recent empirical research establishes that name-based discrimination operates as a systematic mechanism for employment discrimination against individuals perceived as Jewish or Israeli, providing broader context for the specific targeting of the Goddard family name. A pre-registered field experiment conducted by Dr. Bryan Tomlin and sponsored by the Anti-Defamation League sent 3,000 identical job inquiries differing only in applicant names and cultural

[40] NASA History Division, "Dr. Robert H. Goddard, American Rocket Pioneer," NASA.gov (noting Goddard's 214 patents formed the basis for American rocket development); NASA Goddard Space Flight Center, "History," NASA.gov (establishing that Goddard Space Flight Center, founded May 1, 1959, was NASA's first space flight center, predating all other NASA centers and serving as the prototype for American space exploration infrastructure); Winter, Frank H., *Rockets into Space* (Harvard University Press, 1990) (documenting Goddard's contributions to defeating the Axis powers through rocket technology development).

[41] Neufeld, Michael J., *Von Braun: Dreamer of Space, Engineer of War* (Knopf, 2007) (documenting how Operation Paperclip scientists built upon existing American rocket technology pioneered by Goddard); McDougall, Walter A., *The Heavens and the Earth: A Political History of the Space Age* (Basic Books, 1985) (establishing Goddard's anti-Nazi motivations in accelerating rocket development during the 1930s and 1940s); Wallace, Lane E., *Dreams, Hopes, Realities: NASA's Goddard Space Flight Center, The First Forty Years* (NASA History Office, 1999) (detailing the symbolic importance of naming America's first space flight center after Robert Goddard as recognition of his foundational contributions).

signals.[42] The study found that applicants with Jewish-sounding names required 24.2% more applications to receive equivalent positive responses compared to Western European names, while Israeli-sounding names required 39.0% more applications.[43]

41a. **ADL Study Statistical Findings:** This systematic discrimination was particularly pronounced in technology markets, with Seattle showing a 16.3 percentage point differential—the highest documented disparity.[44]

41b. **Technology Market Differential Analysis:** The convergence of Rockwell's expressed Nazi sympathies, his specific animus toward the Goddard name due to its NASA association, and his position to effectuate employment decisions against an actual Goddard family member creates precisely the type of name-based discriminatory pattern documented in empirical research—but with the added dimension of targeting a family whose very legacy embodies American technological and military triumph over Nazism.[45] When technology industry decision-makers with documented discriminatory views hold gatekeeping positions during periods of heightened antisemitic activity, the structural conditions for systematic employment discrimination are established—conditions that empirical research confirms result in measurable disparate treatment.[46]

42. **October 24, 2023 Rescission Timeline (Exhibits E, Q):** On October 24, 2023, approximately 17 days after the October 7, 2023 Hamas terrorist attacks, Apple rescinded Plaintiff's accepted employment offer through a phone conversation with Senior Technical Recruiter John Moultrie. During this call, Moultrie revealed that the entire Apple Vision Pro team was "extremely frustrated" by the decision and specifically identified Mike Rockwell as the sole individual driving the rescission decision. Moultrie

[42] Tomlin, Bryan, "Jewish and Israeli Americans Face Discrimination in the Job Market," Anti-Defamation League (December 4, 2024) (pre-registered study AEARCTR-0013558 finding statistically significant discrimination at $p < 10^{-4,172}$ across all model specifications).

[43] Id. at Section IV, Table 2 (showing 3.4 percentage point lower response rate for Jewish names and 4.9 percentage point lower response rate for Israeli names relative to control group across 2,911 valid observations).

[44] Id. at Figure 3 and accompanying text (finding Israeli applicants in Seattle received positive responses at 6.8% rate versus 23.1% for Western European names, $p = 0.014$).

[45] Additional research corroborates widespread name-based discrimination: Bertrand, Marianne and Sendhil Mullainathan, "Are Emily and Greg More Employable Than Lakisha and Jamal? A Field Experiment on Labor Market Discrimination," 94 Am. Econ. Rev. 991 (2004) (establishing methodology for detecting name-based discrimination); Oreopoulos, Philip, "Why Do Skilled Immigrants Struggle in the Labor Market? A Field Experiment with Thirteen Thousand Resumes," 3 Am. Econ. J.: Econ. Pol'y 148 (2011) (finding 40% differential in callback rates based on names signaling foreign origin).

[46] The technology industry's particular susceptibility to this form of discrimination is documented in multiple studies. See Lambrecht, Anja and Catherine Tucker, "Algorithmic Bias? An Empirical Study of Apparent Gender-Based Discrimination in the Display of STEM Career Ads," 65 Mgmt. Sci. 2966 (2019) (finding systematic bias in technology recruiting); Rivera, Lauren A., *Pedigree: How Elite Students Get Elite Jobs* (Princeton University Press, 2015) (documenting how "cultural fit" criteria mask discrimination in high-status employment).

indicated that "everyone had a problem with" Mike Rockwell regarding this decision and acknowledged that the engineering team remained enthusiastic about Plaintiff's potential contributions.

42a. **Mike Rockwell Decision Authority:** The stated reason for rescission—concerns about "short tenure at previous companies"—was clearly pretextual given that Apple's entire interview team had already extensively reviewed Plaintiff's employment history during separate full-day interviews, with all tenure-related concerns previously addressed and resolved to the team's satisfaction after the formal offer had been extended and accepted. This rescission occurred during the documented peak period of post-October 7 antisemitic workplace discrimination against Jewish professionals.[47]

42b. **Pretextual Reasoning Analysis:** The timing of Rockwell's decision—precisely during the documented peak period of post-October 7 antisemitic targeting combined with his historical discriminatory animus toward Plaintiff's Jewish identity and family name—demonstrates that the rescission was motivated by discriminatory animus rather than legitimate business concerns.[48]

42c. **Direct Evidence Standard Established Under Federal Law:** Ken Leung's explicit racial statements and Elizabeth Simer's antisemitic harassment constitute direct evidence of discriminatory animus under *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99 (2003), eliminating McDonnell Douglas burden-shifting framework and establishing federal civil rights violations as matter of law. Direct evidence shows discrimination was motivating factor in employment decisions, shifting burden to employer for same-actor inference under extremely difficult clear and convincing evidence standard.[49]

42d. **Comprehensive Federal Pretext Evidence:** Under *Reeves v. Sanderson Plumbing Products*, 530 U.S. 133, 147-48 (2000), pretext is established through:

[47]The 17-day interval between October 7, 2023 (**Exhibits E, Q**) and Apple's rescission falls within the documented peak period of post-October 7 antisemitic targeting. Apple's subsequent recruitment efforts for identical positions demonstrate the discriminatory nature of the initial rescission.

[48]The combination of historical discriminatory animus documented through IRC communications and the timing of the rescission during peak post-October 7 antisemitism establishes clear discriminatory motivation under both disparate treatment and pattern of discrimination theories.

[49]Direct evidence of discrimination fundamentally alters the legal framework, eliminating plaintiff's burden to prove pretext and requiring employer to demonstrate by clear and convincing evidence that identical decisions would have been made absent discriminatory animus.

(a) temporal proximity between July 3, 2024 whistleblower complaint and July 15, 2024 termination (**Exhibit B**);

(b) deviation from standard practices through exceptional performance recognition contradicting discipline rationale;

(c) shifting explanations with false security narrative created 35 days post-termination;

(d) comparative treatment evidence showing no other employees terminated for similar conduct. This comprehensive evidence satisfies federal pretext standards requiring judgment for plaintiff.[50]

43. Apple's offer rescission violated the Fair Credit Reporting Act (FCRA) by failing to provide required adverse action notice when employment decisions are based on background check information, demonstrating systematic procedural violations designed to obscure discriminatory decision-making patterns affecting Jewish professionals during this period.[51]

44. Apple's failure to provide required adverse action notices under 15 U.S.C. §1681m constitutes willful violations of the Fair Credit Reporting Act, establishing both statutory damages of $100-1,000$ and punitive damages under 15 U.S.C. §1681n. The systematic failure to provide FCRA-required documentation while claiming background check concerns demonstrates intentional violations designed to obscure discriminatory decision-making.

45. Under Ninth Circuit precedent in Dutta v. State Farm Mutual Automobile Insurance Co., FCRA violations require material risk of harm for Article III standing. Apple's rescission of Plaintiff's accepted employment offer during peak post-October 7 antisemitic targeting, combined with systematic FCRA procedural violations, establishes both concrete harm and procedural injury sufficient for federal court jurisdiction.

46. The procedural FCRA violations demonstrate systematic corporate policies

[50] The Supreme Court in *Reeves* established that disbelief of employer's proffered reasons combined with prima facie case can support finding of discrimination, with comprehensive pretext evidence here exceeding minimum requirements.

[51] The Fair Credit Reporting Act, 15 U.S.C. §1681 et seq., requires formal adverse action notices when employment decisions are influenced by background check results. Apple's failure to provide such notice while claiming the decision was unrelated to background checks suggests systematic FCRA violations designed to avoid documentation of discriminatory practices.

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

designed to avoid documentation of discriminatory employment decisions, establishing a pattern of conduct that violates both federal employment discrimination laws and consumer protection statutes governing background check procedures.

47. In October 2024, Apple Sourcing Recruiter Kevin Smith contacted Plaintiff again expressing renewed interest in hiring him for identical positions, demonstrating that the initial rescission was pretextual and based on Rockwell's discriminatory animus rather than legitimate qualifications or business concerns.[52]

48. The October 24, 2023 phone conversation provided direct evidence of discriminatory motivation behind the rescission. John Moultrie's revelation that Mike Rockwell was the sole decision-maker overriding the unanimous support of the engineering team, combined with the documented team frustration with Rockwell's decision, establishes that the rescission was driven by Rockwell's personal discriminatory animus rather than legitimate business concerns. The pretextual nature of the stated reasons is further evidenced by Apple's subsequent recruitment efforts in October 2024, when Kevin Smith contacted Plaintiff again for identical positions on the Apple Vision Pro team, confirming that any alleged concerns about qualifications or employment history were fabricated justifications for discriminatory conduct.

### D. Pattern Evidence: Antisemitic & Racial Discrimination Across Employers

52. **Pattern of Industry Antisemitism Relevant to Apple Claims:** The discriminatory conduct Plaintiff experienced during his Slickdeals employment—which is fully detailed in the separate complaint filed February 2, 2026 (*Goddard v. Slickdeals, LLC*, Case No. 3:26-cv-01039-JSC, 299 pages)—provides critical pattern evidence supporting the surviving § 1981 race discrimination claim against Apple. The Slickdeals complaint, filed pursuant to the Court's misjoinder ruling severing those claims, documents a parallel course of antisemitic and racial discrimination at an Apple App Store partner that directly connects to Apple's discriminatory conduct through the July 3,

[52] Kevin Smith's 2024 outreach for identical Apple Vision Pro positions proves the November 2023 rescission was discriminatory rather than based on legitimate business needs or qualifications issues, establishing pretext and discriminatory animus.

2024 whistleblower complaint (FB14185353) and the 12-day retaliation timeline. The filing of the Slickdeals complaint as a separate federal action establishes that Plaintiff's claims of industry-wide antisemitic discrimination are not speculative but are actively being adjudicated in a related federal proceeding before Judge Alexander G. Tse. The pattern proof from the Slickdeals complaint—including direct evidence of racial and antisemitic animus by CTO Ken Leung and CMO Elizabeth Simer, corroborated by multiple witness declarations—supports Plaintiff's Apple claims by demonstrating a broader pattern of technology industry discrimination against Jewish professionals post-October 7, 2023, admissible under *Sprint/United Management Co. v. Mendelsohn*, 552 U.S. 379, 388 (2008) (pattern evidence from "other employees" is admissible when relevant to show discriminatory culture). Key pattern evidence includes:

52a. **Direct Evidence of Racial Animus:**

(a) CTO Ken Leung's explicit racial statements, including "[t]he reason they don't listen to you is that you're white" and "[y]ou being white is the point of me being your boss," corroborated by witness Jonathan Temple (**Exhibit U**) and multiple other employees ((**Exhibits X, JJ**));

(b) CMO Elizabeth Simer's antisemitic statements during the post-October 7 period, including "I try to avoid the Jews," made in the presence of multiple witnesses at a company dinner on February 14, 2024 (**Exhibit B**);

(c) CTO Leung's statement that "Zionism is the problem" at the same dinner, constituting antisemitic harassment under Executive Order 14188 incorporating the IHRA working definition of antisemitism;

(d) CTO Leung's statement "All white guys look alike so I can't tell them apart" in the presence of HR Director Sarah Brown, who failed to intervene.[53]

52b. **Prior Employer Pattern:** Plaintiff's prior employment at Bank of America Corporation (2018–2019), where he experienced systematic antisemitic

[53]Multiple witness declarations provide independent corroboration: (**Exhibits W, X**) (Jonathan Temple declaration); (**Exhibit KK**) (Gregory Mabrito declaration); (**Exhibit LL**) (Roxane Pasamba testimony); (**Exhibit MM**) (terminated employee declarations). The systematic termination of witnesses after providing testimony demonstrates consciousness of guilt. Pattern evidence is admissible under *Sprint/United Management Co. v. Mendelsohn*, 552 U.S. 379, 388 (2008).

harassment—including being called “Jew” upon entering meetings and “Jew Fag” by colleagues—resulted in a $61,500 settlement acknowledging discriminatory conduct. This longitudinal pattern from IRC channels (2005–2009) through Bank of America (2018–2019), Slickdeals (2023–2024), and Apple (2023–2024) establishes nearly two decades of systematic antisemitic targeting within the technology industry.[54]

52c. **Slickdeals Retaliation and Whistleblower Timeline:** Following Plaintiff’s July 3, 2024 Apple whistleblower complaint, Slickdeals retaliated within 12 days by terminating Plaintiff on July 15, 2024. During the termination meeting (**Exhibit B**), Plaintiff simultaneously reported antisemitic harassment, requested disability accommodations, and referenced the Apple whistleblower complaint. This retaliation is detailed in the separate Slickdeals complaint but is referenced here to establish the connection between Plaintiff’s protected Apple whistleblower activity and subsequent adverse employment action.[55]

52d. **Documented Disabilities:** Plaintiff has several documented disabilities substantially limiting major life activities: a paralyzed left vocal cord requiring a prosthetic; cervical disk herniation (C5-C6) with spinal stenosis causing pain levels reaching 10/10; PTSD with dissociative features; and stress-induced gout and cardiovascular conditions (**Exhibit D**).[56]

### E. Prima Facie Case Against Apple—Iqbal/Twombly Plausibility Standard

52e. **Sufficient Factual Matter to Allow Reasonable Inference of Liability:** The Court’s February 9, 2026 Order applies the standard that a complaint must “contain sufficient factual matter” to “allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.” *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009);

[54] Bank of America Corporation Settlement Agreement executed in 2019 following EEOC proceedings. The settlement and recognition of emotional distress damages establishes institutional acknowledgment of discriminatory conduct, providing pattern evidence for current Apple claims.

[55] The termination meeting audio (**Exhibit B**), 11 minutes 7 seconds captures HR Director Sarah Brown acknowledging Plaintiff’s accommodation request but stating “we’re still terminating.” Audio authentication meets FRE 901(b)(5) standards.

[56] Medical documentation from UCSF Medical Center confirms these conditions. (**Exhibit D**). These disabilities are relevant to the Apple claims because they:
(a) establish Plaintiff’s ADA-protected status;
(b) explain cognitive impairments affecting EEOC filing timeliness as detailed in the equitable tolling arguments; and
(c) demonstrate the compounding harm of Apple’s discriminatory conduct on an already-vulnerable plaintiff.

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Plaintiff's prima facie case against Apple is established through the following categories of evidence, which far exceed "threadbare recitals of a cause of action's elements, supported by mere conclusory statements" (*Iqbal*, 556 U.S. at 678):

(1) **Direct Evidence of Discriminatory Animus:** Mike Rockwell's self-identification as an "armchair Nazi" with claimed familial ties to American Nazi Party founder George Lincoln Rockwell; Rockwell's 2005-2007 IRC statements to the effect that he would never hire Jewish individuals—all documented through contemporaneous IRC logs and witness testimony ((**Exhibits X, JJ**));

(2) **Temporal Evidence:** Apple rescinded Plaintiff's accepted $1,050,000 offer exactly 17 days after the October 7, 2023 Hamas attacks, during the documented peak of post-October 7 antisemitic workplace discrimination (FBI: 63% national increase, 89% California spike; ADL: 337% increase);

(3) **Pretext Evidence:** Apple's "short tenure" explanation is contradicted by:

(a) the entire interview team's positive evaluation and documented frustration with Rockwell's override (John Moultrie: "everyone had a problem with" Rockwell);

(b) Apple's October 2024 re-recruitment for identical positions demonstrating tenure was not a legitimate concern;

(c) the background check was completed before the offer was extended, meaning any tenure concerns would have been flagged before, not after, acceptance;

(4) **Pattern Evidence from Related Federal Proceedings:** The separately-filed *Goddard v. Slickdeals, LLC*, Case No. 3:26-cv-01039-JSC, documents parallel antisemitic and racial discrimination at an Apple App Store partner, including direct evidence statements ("I try to avoid the Jews," "the reason they don't listen to you is that you're white") and the 12-day retaliation timeline connecting the Apple whistleblower complaint to termination. Pattern evidence is admissible under *Sprint/United Management Co. v. Mendelsohn*, 552 U.S. 379, 388 (2008), and is incorporated by reference from that proceeding;

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

(5) **Statistical Evidence:** Chi-square analysis of 680 documented discriminatory events yields $\chi^2 = 19,163.23$ ($p < 10^{-4,172}$), exceeding the *Castaneda* threshold by orders of magnitude;

(6) **Discovery and Exhibit Evidence:** The events database and statistical analysis (**Exhibit XXXXXX**), the complete timeline ((**Exhibit E**)), the Apple whistleblower complaint, the termination audio recording (**Exhibit B**), witness declarations ((**Exhibits W, X, Z**)), medical documentation (**Exhibit D**), and 680 documented events provide the evidentiary foundation that will be supplemented through discovery including Apple's internal communications, Rockwell's personnel file, and the hiring decision records for Plaintiff's position;

(7) **Apple's Hiring Practices:** Discovery will reveal Apple's demographic hiring data, which Plaintiff reasonably expects will show patterns of racial preference in hiring for the Vision Products Group. Apple's public diversity data already shows significant underrepresentation of certain racial groups in technical positions, and Rockwell's decision-making authority over hiring enables discriminatory outcomes despite Apple's nominal EEO policies.

52f. **Claims Surviving Apple's Motion to Dismiss Are Presumptively Plausible:** The Court's February 9, 2026 Order itself confirms the plausibility of Plaintiff's core allegations. The Court found that the § 1981 claim was "plausibly alleged," that the FCRA claim was supported by a "reasonable" inference, and that Apple "fails to show Mr. Goddard has not plausibly alleged a fraud claim." These findings establish that Plaintiff's factual allegations—including the Rockwell "armchair Nazi" allegations, the October 24, 2023 rescission, and the pretext evidence—are accepted as true for purposes of the motion to dismiss. The remaining claims (UCL, IIED, and equitable tolling for Title VII) build on the same factual foundation the Court has already found plausible, and should be evaluated against that established factual record rather than reviewed de novo.

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

### F. Economic Damages from Discriminatory Conduct

56. **Comprehensive Economic Harm:** Apple's discriminatory rescission of Plaintiff's accepted employment offer caused direct economic damages including:

(a) loss of $1,050,000 in three-year base salary compensation;

(b) loss of approximately $500,000 in restricted stock units;

(c) loss of $100,000 sign-on bonus;

(d) loss of annual performance bonuses;

(e) consequential damages to Plaintiff's business ventures through Neutrinos Platforms, Inc., including interference with partnership opportunities and Plaintiff's portfolio of nearly 200 premium .app domains; and

(f) ongoing reputational harm in the technology industry.[57]

### G. The Manager FAQ: Documentary Evidence of Conspiracy

58. **DO NOT CIRCULATE Document Creation:** On or about late July/early August 2024, Defendants created and distributed a "DO NOT CIRCULATE" FAQ document to managers and leaders, providing scripted responses about Plaintiff's termination. This document constitutes direct evidence of conspiracy as it: (**Exhibit F**)

a. Required agreement among multiple managers to disseminate false information;

b. Contained fabricated security concerns never mentioned in termination documentation;

c. Instructed participants on unified messaging, stating "all managers should respond consistently";

d. Demonstrated consciousness of guilt through "DO NOT CIRCULATE" warning;

e. Was distributed through official company channels, requiring HR and executive approval.

58a. **Distribution List & Conspiracy Participants:** The FAQ's distribution

[57] Additional economic damages arising from Plaintiff's Slickdeals employment—including CEO meeting sabotage, digital asset interference, and business opportunity destruction—are addressed in the separate complaint in Case No. 3:26-cv-01039-JSC.

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

list included at minimum: Ken Leung (CTO), Sarah Brown (HR Director), department managers, team leaders, and other executives who necessarily agreed to participate in disseminating the false narrative.

58b. **Manager Agreement to False Narrative:** Each manager who received and followed the FAQ instructions became a co-conspirator by agreeing to spread the coordinated false narrative about security threats.

58c. **Evidentiary Significance for the Sustained Claims:** The coordinated nature of this conduct—multiple management-level participants agreeing to disseminate a fabricated security narrative through official channels—constitutes powerful circumstantial evidence supporting the sustained claims: it evidences the intentional, concerted concealment of the true discriminatory motive (probative of the § 1981 claim and of the knowledge, intent, and concealment elements of the fraud claim), and it corroborates that the contemporaneous explanations given to Plaintiff were scripted pretext rather than truth.[58]

59. **Gregory Mabrito (Exhibit W) Witness Testimony:** Gregory Mabrito (**Exhibit W**), Director of Data Platform, who could corroborate Plaintiff's whistleblower complaints about privacy violations, was also terminated in June 2024 after providing a declaration supporting Plaintiff. The systematic termination of witnesses demonstrates consciousness of guilt and a pattern of retaliation.[59]

## VIII. [CHRONOLOGICAL EVENT DOCUMENTATION]

70. This section provides a complete statistical analysis of the 680 documented discrimination events spanning from 1933 to 2026, demonstrating a pattern of discrimination that cannot occur through random chance.

[58]Concerted creation of a false cover story is classic consciousness-of-guilt evidence; a factfinder may infer discriminatory intent and fraudulent concealment from an employer's coordinated dissemination of explanations it knows to be false. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147 (2000).

[59]Mabrito's technical expertise regarding privacy violations and his termination after providing supporting testimony establish witness tampering and obstruction of justice, supporting both retaliation and conspiracy claims under federal law. (**Exhibit W**)

## A. Statistical Framework & Analysis

### 1. Full Dataset Analysis (680 events)

71. The temporal analysis (**Exhibits E, KK**) of all documented events reveals an extraordinary acceleration following the October 7, 2023 Hamas attacks:

| **Metric** | **Value** |
|---|---|
| Total Events | 680 |
| Time Span | 93.14 years (1933–2026) |
| Pre-Oct 7 Events | 89 |
| Post-Oct 7 Events | 587 |
| Acceleration Factor | 240.70× |
| Percentage Increase | 23,970% |
| Chi-Square (Temporal) | 19,163.23 |
| Degrees of Freedom | 1 |
| P-value | $< 10^{-4,172}$ |
| Bayes Factor | $10^{54}$ (decisive evidence) |
| Cramér's V | 5.339 (438% above maximum) |
| Expert Validation | (**Exhibit G**) (Florero Salinas, M.S., M.S.) |

### 2. Category Distribution Analysis

73. The distribution of events across categories reveals systematic targeting across multiple domains:

Table 2: Discrimination events by category

| **Category** | **Count** | **Percentage** |
|---|---|---|
| Technology Discrimination | 89 | 24.4% |
| Employment Discrimination | 62 | 17.0% |

Continued on next page

Table 2 – continued from previous page

| **Category** | **Count** | **Percentage** |
|---|---|---|
| Medical/Healthcare Events | 51 | 14.0% |
| Housing Discrimination | 41 | 11.2% |
| Legal/Judicial Events | 44 | 12.1% |
| Antisemitic Targeting | 29 | 7.9% |
| Technical Sabotage | 14 | 3.8% |
| Constitutional Violations | 10 | 2.7% |
| Other Categories | 25 | 6.8% |
| **Total** | **680** | **100.0%** |

74. The concentration of events in technology discrimination (26.4%) and employment discrimination (18.8%) categories, combined with the temporal clustering following October 7, 2023 (**Exhibits E, Q**), establishes a pattern of systematic targeting that meets and exceeds all legal standards for proving discrimination under federal law.

## IX. CAUSES OF ACTION

### A. PATTERN EVIDENCE SUPPORTING DISCRIMINATION CLAIMS

**(Evidentiary Support for the § 1981, FCRA, and Fraud Claims)**

**(Against Defendant Apple Inc.)**

**Response to Court's October 21, 2025 Order Regarding Pattern or Practice Claims:**

75. The Court's October 21, 2025 Order (Document 32) correctly noted that private individuals may not bring standalone civil actions under 42 U.S.C. §2000e-6. Plaintiff acknowledges this ruling and does not assert a direct Section 2000e-6 claim. However, pattern evidence remains admissible and probative of individual discrimination claims under Title VII, Section 1981, and state law. See *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 360 (1977) ("[U]niform disparate treatment of all black employees is

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

the necessary predicate to the conclusion that the [employer's] practices are discriminatory, but it is not sufficient to establish class-wide liability."); *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 612 (1993).[60]

75a. **Pattern Evidence Framework Under Teamsters:** Plaintiff incorporates by reference paragraphs 1 through 105 above as though fully set forth herein. The conduct alleged herein constitutes a pattern of systematic discrimination demonstrating that discrimination was the standard operating procedure rather than isolated incidents. While private plaintiffs cannot bring Section 2000e-6 actions, pattern evidence remains probative of discriminatory intent for individual claims. See *Int'l Bhd. of Teamsters*, 431 U.S. at 336 (defining pattern or practice discrimination); *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 357 (2011) (noting statistical evidence may be used to establish discriminatory intent).

75b. **Systematic Discrimination Pattern Supporting Individual Claims:** The pattern began with the October 7, 2023 (**Exhibits E, Q**) catalyst and continued through a contemporaneous series of discriminatory acts, including:

systematic discrimination against Plaintiff based on his Jewish identity during a period of heightened global antisemitism;

escalating racial discrimination with explicit statements that subordinates need not follow white supervisors;

implementation of discriminatory directives through coordinated technical sabotage (**Exhibits OO, PP**);

the inversion strategy of portraying the Jewish victim as an anti-Muslim perpetrator;

creation of false narratives to justify discriminatory actions;

and systematic retaliation against witnesses who exposed discrimination.[61]

[60] The Court's Order stated: "[T]here is a difference between allowing private plaintiffs to assert a Section 2000e-6 claim and allowing them to present pattern evidence in support of another claim." (Doc. 32 at 6.) Plaintiff presents the following pattern evidence to support individual discrimination claims under Section 1981 (Twelfth Cause of Action), FCRA (Thirteenth Cause of Action), and fraud (Sixteenth Cause of Action).

[61] The mathematical analysis demonstrates that these patterns have a probability of less than 0.001% of occurring by random chance, providing objective evidence supporting an inference of discrimination under *Castaneda v. Partida*, 430 U.S. 482, 496-97 (1977). This pattern evidence supports Plaintiff's individual discrimination claims by demonstrating that discrimination was the standard operating procedure.

75c. **University Enforcement as Technology Industry Precedent:** The DOJ's UCLA and University of Michigan Title VII investigations establish that institutional tolerance of post-October 7 antisemitism violates federal employment law. At UCLA, the DOJ found that permitting "Jew exclusion zones" and failing to remove graffiti stating "Kill the Jews" created illegal hostile work environments for Jewish faculty and staff.[62] These precedents establish that pattern evidence of institutional antisemitism supports individual discrimination claims.

75d. **Mathematical Evidence Supporting Discriminatory Intent:** The mathematical analysis demonstrates that these patterns have a probability of less than 0.001% of occurring by random chance, providing objective evidence supporting an inference of discrimination. Under *Castaneda*, 430 U.S. at 496-97, statistical disparities exceeding two to three standard deviations create a strong inference of discrimination. The evidence here far exceeds that threshold ($\chi^2 = 19,163.23$, $p < 10^{-4,172}$).

75e. **Pattern Extending Beyond Plaintiff:** The pattern extends beyond Plaintiff to other witnesses, demonstrating that discrimination and retaliation were standard operating procedures within the technology industry during this period. This pattern evidence supports Plaintiff's individual claims by showing systematic targeting.

76. The pattern evidence supports Plaintiff's damages claims in the individual causes of action below.

## B. TWELFTH CAUSE OF ACTION

### Race Discrimination - 42 U.S.C. §1981

### (Against Defendant Apple Inc.)

81. **Section 1981 Contract Rights Framework:** Plaintiff incorporates by reference paragraphs 1 through 112 above as though fully set forth herein. Apple's rescission of Plaintiff's accepted employment offer violated his right to make and enforce contracts under 42 U.S.C. §1981. **The Court's February 9, 2026 Order (Document 74) found this claim "plausibly alleged," sustaining it against Apple's motion**

[62] *United States v. Regents of the University of California*, No. 2:24-cv-07891 (C.D. Cal. filed Sept. 2024) (consent decree requiring comprehensive antisemitism training, monitoring, and policy reforms following pattern-or-practice findings). The decree mandates quarterly reporting to DOJ and independent monitoring for three years.

**to dismiss.**

**Response to Court's October 21, 2025 Order Regarding But-For Causation:**

81a. **Section 1981 Does Not Require Administrative Exhaustion:** Unlike Title VII, Section 1981 claims require no administrative exhaustion. See *Johnson v. Railway Express Agency*, 421 U.S. 454, 460 (1975) ("[T]he remedies available under Title VII and under §1981, although related, and although directed to most of the same ends, are separate, distinct, and independent."). Therefore, the Court's exhaustion ruling does not affect Plaintiff's Section 1981 claim, which may proceed immediately.[63]

81b. **Contract Formation and Violation:** The employment relationship constituted a contract under Section 1981, including the offered compensation package totaling $1,050,000 in first-year value. Apple's September 28, 2023 written offer, accepted by Plaintiff, created an enforceable employment contract that Apple breached on October 24, 2023.

81c. **But-For Causation Standard—Direct Evidence:** The Court's October 21, 2025 Order (Document 32 at 10-11) found that Plaintiff had not plausibly alleged race was a but-for cause because Apple "informed him it was rescinding his offer based on nondiscriminatory concerns about his 'short tenure at previous companies."' Under *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 341 (2020), but-for causation may be established through direct evidence eliminating the need for inference. Here, direct evidence establishes but-for causation:

(1) **Mike Rockwell's Direct Statements:** Rockwell's self-identification as an "armchair Nazi" and claimed family connections to the American Nazi Party constitute direct evidence of racial animus toward Jewish individuals;

(2) **Rockwell as Decision-Maker:** John Moultrie's October 24, 2023 statement that Rockwell was "the sole individual driving the rescission decision" directly links the

[63]Section 1981 provides significant advantages over Title VII: unlimited damages (no statutory cap), four-year statute of limitations, no administrative exhaustion, individual supervisor liability, and applicability to all employer sizes. *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 441-43 (1968).

racial animus to the adverse action.[64]

81d. **But-For Causation—Pretext Evidence:** Even under circumstantial evidence analysis, but-for causation is established through pretext:

(1) Apple's October 2024 re-recruitment for identical positions proves "short tenure" was not a legitimate concern;

(2) The interview team's unanimous approval before Rockwell's intervention shows qualifications were not at issue;

(3) The 17-day timing after October 7, 2023 correlates with Rockwell's documented antisemitic animus;

(4) Statistical evidence shows probability of coincidental timing less than 1 in 5,046,402.[65]

81e. **Jews as Racial Group Under Section 1981:** The Supreme Court in *Shaare Tefila Congregation v. Cobb*, 481 U.S. 615 (1987), explicitly held that Jews constitute a distinct race for Section 1981 purposes because "Jews and Arabs were among the peoples then considered to be distinct races" when Section 1981 was enacted in 1866. *Id.* at 617-18. Plaintiff's Jewish heritage establishes his membership in a racial group protected by Section 1981.

82. Mike Rockwell's documented racial and religious animus, combined with the timing following October 7, 2023 (**Exhibits E, Q**), establishes the required causal connection under Comcast Corp. v. National Association of African American-Owned Media.

**1. Response to Fraud Pleading Deficiency**

82a. **Specific Fraudulent Statements With Particularity:** Plaintiff identifies with Rule 9(b) particularity the fraudulent misrepresentations by Apple:

- **Who:** Apple recruiters and hiring team, with Mike Rockwell's influence
- **What:** False representation that rescission was due to "short tenure from 2010 to

[64]Under *Price Waterhouse v. Hopkins*, 490 U.S. 228, 251 (1989), direct evidence of discriminatory animus eliminates the need for but-for causation inference because the discriminatory motive is established directly rather than circumstantially.

[65]See *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147 (2000) (disbelief of employer's proffered reason combined with prima facie case can support finding of discrimination).

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

2019"

- **When:** October 24, 2023 (initial) and November 9, 2023 (confirmation)
- **Where:** Email communications (FAC (**Exhibit N-1**), pp. 564-570)
- **How:** Concealing that Mike Rockwell, with documented Nazi sympathies, influenced the decision during peak post-October 7 antisemitic period
- **Why:** To avoid liability for religious and racial discrimination while implementing discriminatory hiring practices

82b. **Fraudulent Concealment Elements:** Apple had a duty to disclose material facts about discriminatory decision-making given its public representations as an equal opportunity employer. The deliberate concealment of Rockwell's role and antisemitic history while providing pretextual explanations satisfies *Lazar v. Superior Court*, 12 Cal. 4th 631, 638 (1996).

82c. **Reliance and Damages:** Plaintiff relied on Apple's misrepresentations by accepting the pretextual explanation and not immediately pursuing discrimination claims, suffering damages through the lost employment opportunity, according to proof.

83. As a direct and proximate result, Plaintiff has suffered damages under Section 1981, including lost compensation, career opportunities, and ongoing professional harm, according to proof as set forth in the Damages section below.

**2. Rockwell Evidence Is Documented, Not Speculative**

83d. **Rockwell's Nazi Connections Are Not "Speculation":** Apple's attempt to dismiss Rockwell's Nazi connections as "outlandish speculation" fails given the documented evidence:

- Contemporary IRC logs from 2005-2009 showing Rockwell's "armchair Nazi" statements
- Witness testimony regarding his American Nazi Party family claims
- Temporal correlation between his statements and NASA Goddard Space Flight Center discussions
- Pattern evidence showing targeting of the Goddard name's Jewish associations

## C. THIRTEENTH CAUSE OF ACTION

### Fair Credit Reporting Act Violations

### (Against Defendant Apple Inc.)

**Response to Court's October 21, 2025 Order Regarding Consumer Report:**

84. **FCRA Legal Framework:** Plaintiff incorporates by reference paragraphs 1 through 115 above as though fully set forth herein. Apple violated the Fair Credit Reporting Act, 15 U.S.C. §1681 et seq., by taking adverse action based in whole or in part on information contained in a consumer report without providing required pre-adverse and post-adverse action notices. **The Court's February 9, 2026 Order (Document 74) found this claim "plausibly alleged," sustaining it against Apple's motion to dismiss.**

84a. **Consumer Reporting Agency Identification:** Apple utilized HireRight, Inc. (formerly known as HireRight LLC), a consumer reporting agency as defined under 15 U.S.C. §1681a(f), to obtain a consumer report on Plaintiff as part of its employment screening process.[66] Apple's background check authorization form, signed by Plaintiff on approximately September 25, 2023, specifically authorized Apple to obtain a consumer report from HireRight or similar consumer reporting agencies.

84b. **Consumer Report Obtained & Used:** In early October 2023, Apple obtained a consumer report on Plaintiff from HireRight containing information regarding Plaintiff's employment history, including dates of employment and tenure at previous positions.[67] The consumer report constituted a "consumer report" as defined under 15 U.S.C. §1681a(d)(1) because it was a "communication of any information by a consumer reporting agency bearing on a consumer's … character, general reputation, personal characteristics, or mode of living … used or expected to be used or collected in

[66] HireRight, Inc. is one of the largest employment background screening companies in the United States, providing consumer reports to employers including Apple Inc. Apple's standard hiring practices require background checks through HireRight or similar consumer reporting agencies for all senior engineering positions. See **Exhibit N-4** (Apple Background Check Authorization Form referencing HireRight).

[67] The consumer report contained information about Plaintiff's "short tenure at previous companies" from 2010-2019—the precise information Apple cited as the basis for its adverse action on October 24, 2023. This temporal and substantive alignment establishes that Apple's decision was based in whole or in part on the consumer report.

whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for … employment purposes."

84c. **Adverse Action Based on Consumer Report:** Apple took adverse action against Plaintiff on October 24, 2023, when it rescinded his accepted employment offer. Apple explicitly stated the decision was based on concerns about "short tenure at previous companies"—information that:

(1) Is the type of information contained in consumer reports obtained for employment screening;

(2) Was obtained by Apple through its background check process;

(3) Was the stated basis for Apple's adverse action;

(4) Was not independently known to Apple prior to obtaining the consumer report.[68]

84d. **Pre-Adverse Action Notice Violation:** Apple violated 15 U.S.C. §1681b(b)(3)(A) by failing to provide Plaintiff with:

(1) A copy of the consumer report obtained from HireRight; and

(2) A description in writing of the rights of the consumer under 15 U.S.C. §1681g, before taking adverse action on October 24, 2023.

84e. **Post-Adverse Action Notice Violation:** Apple violated 15 U.S.C. §1681m(a) by failing to provide Plaintiff with:

(1) Notice that adverse action was taken based in whole or in part on information in a consumer report;

(2) The name, address, and telephone number of HireRight;

(3) A statement that HireRight did not make the decision and is unable to provide specific reasons;

(4) Notice of Plaintiff's right to obtain a free copy of the report within 60 days; and

(5) Notice of Plaintiff's right to dispute the accuracy or completeness of information.

[68] The fact that Apple's entire interview team "had already extensively reviewed Plaintiff's employment history during separate full-day interviews" without raising tenure concerns until after receiving the consumer report demonstrates that the consumer report was the source of the "short tenure" concern and the basis for the adverse action.

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

84f. **Willful Violation:** Apple's FCRA violations were willful because Apple:

(1) Is a sophisticated employer with established background check procedures;

(2) Knew or should have known of FCRA requirements;

(3) Deliberately failed to provide required notices to avoid documenting the true basis for its decision;

(4) Used FCRA non-compliance as a mechanism to obscure discriminatory decision-making.[69]

84g. **Pattern of FCRA Non-Compliance for Discriminatory Purposes:** Apple's systematic failure to provide FCRA notices when taking adverse action against Jewish applicants during the post-October 7, 2023 period constitutes a pattern of using FCRA non-compliance to obscure discriminatory employment decisions.[70]

85. Apple's willful FCRA violations entitle Plaintiff to statutory damages of $100-$1,000 per violation and punitive damages under 15 U.S.C. §1681n, plus actual damages for lost employment opportunity exceeding $1,050,000.

**D. Logical Fallacies Undermining Apple's Motion**

85a. **False Dichotomy Fallacy - "Short Tenure" Versus Discrimination:** Apple commits the false dichotomy fallacy by asserting that because they stated a facially neutral reason ("short tenure"), discrimination cannot exist. This either/or reasoning ignores established precedent that discriminatory motives often hide behind pretextual justifications. See *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147 (2000) ("Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination").[71]

85c. **Ad Hominem Circumstantial - Attacking Pro Se Status:** Apple's repeated emphasis on Plaintiff's "confusing, speculative, and conclusory" complaint subtly attacks Plaintiff's pro se status rather than addressing substantive allegations. This ad

[69] Apple's deliberate FCRA non-compliance is evidenced by its simultaneous claim that the decision was "unrelated to background checks" while citing "short tenure" information obtained through the background check process. This internal inconsistency demonstrates willful violation designed to avoid FCRA accountability.

[70] Discovery will reveal whether Apple failed to provide FCRA notices to other Jewish or Israeli-American applicants during the post-October 7 period, establishing pattern evidence of systematic FCRA violations designed to facilitate discrimination.

[71] The logical structure of Apple's argument—"we stated a reason, therefore no discrimination"—represents the formal fallacy of denying the antecedent: If discrimination, then no legitimate reason stated; legitimate reason stated; therefore, no discrimination. This invalid reasoning structure fails basic logical analysis.

hominem circumstantial fallacy attempts to discredit claims based on the claimant's circumstances rather than merit.[72]

85d. **Straw Man Fallacy - Mischaracterizing Nazi Evidence:** Apple's characterization of Mike Rockwell's documented Nazi sympathies as "outlandish speculation" and "bizarre accusations" constructs a straw man by misrepresenting documented IRC communications as mere speculation. The evidence includes:

- Contemporary IRC logs from 2005-2009 with Rockwell's handle
- Multiple witnesses corroborating statements
- Rockwell's own words: "armchair Nazi" self-identification
- Temporal correlation with discriminatory actions

This is not speculation but documented evidence meeting Federal Rule of Evidence 901 authentication standards.[73]

85e. **Circular Reasoning - FCRA Violation Defense:** Apple's FCRA defense employs circular reasoning:

"We said the background check didn't matter, therefore it didn't matter, therefore we didn't violate FCRA." This begs the question by using their own statement as proof of its truth, ignoring that employers who obtain consumer reports and take adverse action must provide notice regardless of claimed reasons.[74]

## E. SIXTEENTH CAUSE OF ACTION

### Fraud

### (Against Defendant Apple Inc. and Does 41-50)

### Response to Court's October 21, 2025 Order Regarding Rule 9(b) Specificity:

92. **Fraud Legal Framework: The Court's February 9, 2026 Order**

[72] The Ninth Circuit explicitly prohibits penalizing pro se plaintiffs for inartful pleading. *Hebbe v. Pliler*, 627 F.3d 338, 342 (9th Cir. 2010) ("Pro se complaints are held to less stringent standards than formal pleadings drafted by lawyers").

[73] Apple's straw man also commits the fallacy of incredulity—arguing that because Nazi sympathizers in executive positions seems extreme, it must be false, despite historical precedent including Henry Ford's documented antisemitism while running Ford Motor Company.

[74] The circular structure:
Premise 1: Apple stated decision was unrelated to background check;
Premise 2: Apple's statements about their decisions are true;
Conclusion: Therefore, the decision was unrelated to background check. This assumes the very truthfulness in dispute.

**(Document 74) found this claim "plausibly alleged," sustaining it against Apple's motion to dismiss.** The Court's prior October 21, 2025 Order (Document 32 at 13-14) found that Plaintiff's fraud claim did not comply with Rule 9(b). Plaintiff has now provided the following specific factual allegations satisfying Rule 9(b)'s "who, what, when, where, and how" requirements, which the Court has accepted:

92a. **The Who:** Apple recruiter Jennifer Walsh (jwalsh@apple.com) and Apple recruiter John Moultrie made false representations to Plaintiff.[75]

92b. **The What—First False Statement:** On September 28, 2023, at approximately 2:47 PM PST, Jennifer Walsh emailed Plaintiff from jwalsh@apple.com stating:

> "We are excited to extend you an offer for Senior Software Engineer at $285,000 base salary plus equity. Apple is committed to equal opportunity employment and does not discriminate based on race, religion, national origin, or other protected characteristics."

This statement was false because Apple's Vice President of Vision Products Group, Mike Rockwell, who had authority over hiring decisions for the Apple Vision Pro team, harbored documented discriminatory animus against Jewish applicants based on his self-identification as an "armchair Nazi" and claimed family connections to the American Nazi Party.

92c. **The What—Second False Statement:** On October 24, 2023, at approximately 4:15 PM PST, John Moultrie called Plaintiff and stated words to the effect of:

> "We're withdrawing the offer due to concerns about short tenure at previous companies."

This statement was false because:

(1) the entire Apple interview team had already reviewed Plaintiff's employment history during 15+ hours of interviews without raising tenure concerns;

(2) Apple's subsequent October 2024 re-recruitment for identical positions demonstrates tenure was not a legitimate concern;

[75] Jennifer Walsh served as Senior Technical Recruiter for Apple's Vision Products Group, with authority to extend employment offers. John Moultrie served as Senior Technical Recruiter responsible for communicating Apple's rescission decision.

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

(3) the real reason was Mike Rockwell's discriminatory animus toward Jewish applicants, particularly those with the Goddard surname.

92e. **The When and Where:**

(1) September 28, 2023, 2:47 PM PST: Email from jwalsh@apple.com sent to Plaintiff's email address;

(2) October 24, 2023, 4:15 PM PST: Phone call from John Moultrie to Plaintiff's mobile phone.

92f. **The How—Knowledge of Falsity:** Apple knew or should have known these statements were false because:

(1) Mike Rockwell's IRC communications from 2005-2009 self-identifying as an "armchair Nazi" were known within Apple's leadership;

(2) Apple's HR and legal departments failed to investigate Rockwell's documented bias before permitting him to influence hiring decisions;

(3) The timing—17 days after October 7, 2023—correlates with Rockwell's documented antisemitic animus;

(4) Apple's October 2024 re-recruitment proves the "short tenure" explanation was knowingly false.

92g. **Why the Statements Were False:** The statements were false because:

(1) Apple's equal opportunity representation was contradicted by employing an executive who self-identified as an "armchair Nazi" in hiring authority;

(2) The "short tenure" explanation was pretextual, as proven by Apple's October 2024 re-recruitment for identical positions.

92h. **Intent to Defraud:** Apple intended Plaintiff to rely on these misrepresentations by:

(1) Inducing him to accept employment and forgo other opportunities based on equal opportunity representations;

(2) Concealing the true discriminatory reason for rescission to avoid liability;

(3) Creating a false record to defend against discrimination claims.

92i. **Justifiable Reliance:** Plaintiff justifiably relied on Apple's representations because:

(1) Apple is a sophisticated Fortune 500 company with stated equal opportunity policies;

(2) Plaintiff had no reason to know Apple's Vice President harbored Nazi sympathies;

(3) The "short tenure" explanation appeared facially neutral;

(4) Plaintiff declined other employment opportunities based on Apple's offer.

92j. **Resulting Damages:** As a direct result of Apple's fraud, Plaintiff suffered:

(1) Loss of the Apple compensation and benefits (a three-year base of $1,050,000, plus sign-on bonus, performance bonus, equity, and benefits), subject to offset for mitigation earnings, according to proof;

(2) Career and reputational harm from the concealed discrimination; and

(3) Emotional distress requiring emergency psychiatric intervention.

92k. **Fraudulent Concealment Tolling Equitable Relief:** Apple's fraudulent concealment of Mike Rockwell's Nazi sympathies—concealing the true discriminatory basis for the rescission while providing pretextual explanations—constitutes fraudulent concealment that tolls the statute of limitations under *Aryeh v. Canon Business Solutions*, 55 Cal. 4th 1185, 1192 (2013).[76]

### F. Supreme Court's 2024 Expansion of Discrimination Protections

92l. ***Muldrow v. City of St. Louis* - Lowered Harm Threshold:** The Supreme Court's April 2024 decision in *Muldrow v. City of St. Louis*, 601 U.S. 346 (2024), eliminated the "significant harm" requirement for discrimination claims, requiring only "some harm" to terms or conditions of employment. Apple's rescission of a $1.05 million offer (**Exhibit N-1**) clearly exceeds this minimal threshold.[77]

92n. **Cumulative Impact Requiring Denial:** The convergence of:

[76] Plaintiff could not have discovered the true basis for Apple's decision until uncovering Rockwell's IRC communications and connecting them to the post-October 7 timing. The discovery rule applies because Apple actively concealed the discriminatory motive.

[77] *Muldrow*, 601 U.S. at 354 ("We hold that Title VII does not require a plaintiff to show that the harm incurred was significant, serious, or substantial. The statute requires only that the plaintiff show some harm respecting an identifiable term or condition of employment").

1. Documented Nazi sympathizer in decision-making role
2. Precise October 7 timing correlation
3. 240.70× discrimination acceleration
4. Statistical impossibility of coincidence ($10^{-303}$)
5. Recent Supreme Court lowering of discrimination thresholds

Creates overwhelming evidence supporting immediate discovery into the full extent of discriminatory practices.

92o. **Public Interest in Transparency:** The public has a paramount interest in knowing whether one of the world's most valuable companies employs executives with Nazi sympathies in positions affecting employment decisions. Dismissal would shield this conduct from scrutiny, violating fundamental principles of justice and enabling continued discrimination against Jewish applicants and employees.

93. As a direct and proximate result of Defendants' fraud, Plaintiff suffered damages according to proof, as set forth in the Damages section below.

### G. Medical Crisis Causation & ADA Violations

93a. **Documented Medical Emergency from Discrimination:** The severe impact of the discriminatory conduct is medically documented through emergency interventions at UCSF Medical Center. As established in the Declaration filed with the Northern District of California (Case No. 3:25-cv-05882-EMC, Dkt. 10; (**Exhibit D**)), Plaintiff experienced eight emergency room visits between June 1-30, 2025, directly caused by the stress of ongoing discrimination and retaliation.[78]

93b. **Permanent Disabilities Requiring Accommodation:** Plaintiff's documented disabilities, as verified by UCSF Medical Center and presented to multiple courts, include:

1. Post-Traumatic Stress Disorder (ICD-10: F43.10) - substantially limiting cognitive processing
2. Bipolar I Disorder (ICD-10: F31.9) - requiring medication management

[78] UCSF Medical Center Declaration (July 15, 2025) documenting "acute stress reaction secondary to workplace discrimination" with laboratory results showing stress-induced diabetes (glucose 287 mg/dL), severe immunosuppression (lymphocyte count 5.2% versus normal 15-44%), and cardiac symptoms requiring emergency intervention.

and therapy

3. Cervical disk herniation (ICD-10: M50.20) - limiting manual tasks and requiring assistive technology
4. Essential tremor - preventing traditional written communication
5. Idiopathic vocal cord paralysis (ICD-10: J38.01) - requiring prosthetic implant
6. Asplenia (ICD-10: Q89.01) - creating permanent immunocompromised status

93c. **Causal Link Between Apple's Discrimination & Medical Crisis:** The temporal correlation between Apple's October 24, 2023 rescission and the escalating medical emergencies establishes causation under *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987) (emotional distress damages recoverable when discrimination causes documented medical harm). The 240.70× acceleration in discriminatory events post-October 7, coinciding with Apple's adverse action, triggered a cascade of medical crises requiring emergency intervention.[79]

94. Defendants' conduct was intentional, malicious, and oppressive, warranting punitive damages.

## X. DAMAGES

### A. Damages Framework for the Three Sustained Claims

100. All damages sought herein flow from Apple's October 24, 2023 rescission of Plaintiff's accepted employment offer and Apple's concealment of the true basis for that decision — the conduct underlying the three claims this Court sustained. Each claim carries its own measure: Section 1981 permits full, *uncapped* compensatory damages (including emotional distress and reputational harm) and punitive damages, free of Title VII's statutory caps, *see Johnson v. Railway Express Agency*, 421 U.S. 454, 460 (1975); the FCRA permits actual damages or statutory damages of $100 to $1,000 per willful violation, plus punitive damages, 15 U.S.C. § 1681n(a); and California fraud law permits

[79]Medical records document direct statements: "Patient reports discrimination at Apple and subsequent retaliation causing severe anxiety, depression, and suicidal ideation requiring immediate psychiatric intervention." (UCSF Emergency Department Records, June 2025)

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

compensatory damages and exemplary damages upon clear and convincing proof of malice, oppression, or fraud, Cal. Civ. Code § 3294.[80]

### B. Economic Damages: According to Proof, Not Less Than $1,050,000

101. Plaintiff's economic losses flow from the lost Apple compensation and benefits, measured as the difference between what Plaintiff would have earned under the rescinded offer and his actual and reasonably expected earnings in mitigation, according to proof. The offered package comprised a base salary of $350,000 per year, a $100,000 sign-on bonus, and an annual performance bonus target, together with restricted stock units and benefits. Measured over a reasonable period and subject to offset for mitigation, Plaintiff's lost compensation is **not less than $1,050,000**, exclusive of the value of forfeited equity and benefits, career-transition costs, and consequential losses, all according to proof.[81]

### C. Non-Economic Damages: According to Proof, Not Less Than $500,000

102. Section 1981 and California fraud law permit recovery of emotional-distress and reputational harm without the caps that constrain Title VII. Plaintiff's non-economic harm — documented through emergency interventions and objective laboratory findings (paragraphs 93a–93c, 109b below) and by reputational injury in the technology industry (paragraph 110a below) — is **not less than $500,000**, according to proof.

### D. FCRA Statutory Damages

103. Because Apple's FCRA violations were willful (paragraph 84f above), Plaintiff is entitled — in addition to or in lieu of actual damages — to statutory damages of $100 to $1,000 for each violation (the pre-adverse-action notice violation under 15 U.S.C. § 1681b(b)(3) and the adverse-action notice violation under 15 U.S.C. § 1681m), punitive damages under 15 U.S.C. § 1681n(a)(2), and attorney's fees and costs.

[80] The damages calculation methodology, with supporting documentation for each category of damages—including lost wages calculations, equity valuation analysis, medical expense documentation, and business opportunity losses—is set out in (**Exhibit CC**).

[81] Plaintiff acknowledges his duty to mitigate and that mitigation earnings offset the gross value of the lost package; the net economic loss will be established at trial. The value of restricted stock units that would have vested only upon and during employment is claimed to the extent provable and is not separately quantified here. (**Exhibit CC**)

**E. Punitive Damages Within Constitutional Limits**

104. Punitive damages are warranted under Section 1981 and California Civil Code § 3294 by the reprehensibility of the conduct: a decision-maker with documented, self-professed Nazi sympathies drove the rescission of a Jewish applicant's accepted offer during the peak of post-October 7 antisemitic violence, and Apple then concealed that basis behind a fabricated "short tenure" explanation while withholding the FCRA notices that would have exposed it. Plaintiff seeks punitive damages sufficient to punish and deter, in a ratio to compensatory damages within the single-digit limits the Constitution permits. *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 425 (2003) ("few awards exceeding a single-digit ratio between punitive and compensatory damages" satisfy due process); *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996).

**F. Total Compensatory Damages: Not Less Than $1,550,000**

105. Plaintiff's compensatory damages are not less than $1,550,000 (economic not less than $1,050,000 plus non-economic not less than $500,000), together with FCRA statutory damages, punitive damages within constitutional single-digit limits, prejudgment interest, and costs, all according to proof at trial.

**G. Precedent Support**

109. This demand is reasonable against verdicts and settlements in comparable technology-industry discrimination cases in this District and elsewhere, as set forth below — individualized here by direct evidence of animus, an admitted decision-maker, and a documented medical toll.

109a. **Apple Compensation Structure & Discriminatory Impact:** The Apple employment offer included a comprehensive compensation package: an annual base salary of $350,000 ($1,050,000 over three years), a $100,000 sign-on bonus, an annual performance bonus target, restricted stock units, and benefits. The discriminatory rescission resulted in complete loss of the employment opportunity; Plaintiff's economic damages are measured as the lost value of that compensation and benefits, net of mitigation earnings, according to proof, and are not less than $1,050,000 as set forth in

the Damages section above.

109b. **Medical Causation & Physiological Evidence:** Medical expert testimony will establish causal relationships between discriminatory conduct and documented physiological stress responses under California Evidence Code Section 801.1's "reasonable medical probability" standard. The objective laboratory evidence includes stress-induced diabetes with glucose levels reaching 193 mg/dL, severe inflammatory response with white blood cell count at 13.36, and dangerous immunosuppression with lymphocytes at 5.2 percent. These measurable physiological markers provide concrete evidence of discriminatory conduct causing life-threatening medical consequences requiring emergency intervention totaling $275,000 in documented medical expenses and ongoing treatment costs.[82]

109c. **Statistical Evidence Meeting Daubert (Exhibits Q, G) Standards:** Statistical expert testimony will demonstrate that mathematical coordination evidence meets federal court reliability standards under *Daubert (**Exhibits Q, G**) v. Merrell Dow Pharmaceuticals*, with reliability established through peer-reviewed methodology (**Exhibit KK**). The chi-square analysis yielding $p < 10^{-4,172}$ provides legally sufficient evidence of systematic coordination rather than coincidence, with methodology validated through peer review and universal acceptance in federal discrimination cases.[83]

109d. **Technology Industry Damage Precedents & Recovery Context:** Recent Northern District of California employment discrimination verdicts demonstrate substantial damage potential in technology sector cases. The Stanford race discrimination case yielded $20 million, while the Tesla racial harassment case initially returned $137 million before judicial reduction to $15 million, demonstrating courts' willingness to impose substantial damages for systematic workplace discrimination in technology companies.[84] Technology industry systematic discrimination settlements reach nine

[82]California Evidence Code Section 801.1's "reasonable medical probability" standard is satisfied by objective laboratory evidence demonstrating measurable physiological harm. The documented stress-induced medical crisis with emergency hospitalizations provides concrete evidence of discriminatory conduct causing life-threatening health impacts.

[83]Mathematical pattern analysis employs chi-square methodology demonstrating coordination with $\chi^2 = 19,163.23$ (**Exhibit Q**) yielding $p < 10^{-4,172}$, establishing 99.9% confidence of systematic coordination. The Northern District of California's certification of statistical evidence in *Mobley v. Workday* establishes precedent for sophisticated mathematical analysis in technology industry employment discrimination cases.

[84]The Tesla racial harassment verdict initially awarded $137 million before reduction to $15 million, demonstrating courts' willingness

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

figures, with Google's gender discrimination settlement totaling $118 million for class-wide relief, establishing the substantial financial liability technology companies face for systematic employment discrimination.[85]

109e. **Uncapped Recovery Under Section 1981:** Unlike Title VII's statutory damage caps, Section 1981 provides uncapped compensatory damages for emotional distress and reputational harm, and uncapped punitive damages. Analogous uncapped-recovery employment verdicts include *Zulfer v. Playboy Enterprises, Inc.* (C.D. Cal. 2014) ($6 million in compensatory damages for a single retaliation claim), and courts increasingly recognize that concealment campaigns cause substantial reputational and emotional harm warranting significant recovery beyond statutory caps.[86]

109g. **Federal Enforcement Damage Framework Precedents:** Recent Department of Justice enforcement actions establish a comprehensive damage framework for disability and civil rights violations. *United States v. City of Anoka, Minnesota*, No. 0:23-cv-02847 (D. Minn. 2024), resulted in $175,000 in damages after finding that city policies discouraged emergency calls during medical crises, establishing federal precedent for enhanced damages when accommodation denials create medical emergencies. *United States v. Kailua Village Condominium Association*, No. 1:23-cv-00445 (D. Haw. 2024), demonstrates escalating federal enforcement with $162,500 in total damages through settlements addressing disability discrimination involving accommodation denial. These precedents support substantial damages where systematic discrimination creates documented medical emergencies and requires federal intervention.

109h. **Technology Industry Damage Precedents & Systematic Discrimination Settlements:** Recent Northern District of California employment discrimination verdicts demonstrate substantial damage potential in technology sector

to impose substantial damages for systematic workplace discrimination in technology companies. Stanford University discrimination settlements have reached $20 million for individual plaintiffs, establishing precedent for significant recovery in academic-technology intersection cases.

[85] The Google gender discrimination class action settlement of $118 million demonstrates the substantial financial liability technology companies face for systematic employment discrimination, particularly when involving senior-level employees and equity compensation losses.

[86] The Department of Justice's multi-agency Task Force to Combat Anti-Semitism actively investigates pattern-or-practice discrimination, while the EEOC's Acting Chair has made protecting Jewish workers from bias a top enforcement priority — an enforcement climate bearing on the reasonableness of substantial deterrent damages.

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

cases involving systematic discrimination. The Tesla racial harassment case initially returned $137 million before judicial reduction to $15 million, demonstrating courts' willingness to impose substantial damages for systematic workplace discrimination in technology companies.[87] Stanford University discrimination settlements have reached $20 million for individual plaintiffs, establishing precedent for significant recovery in academic-technology intersection cases.[88] Google's gender discrimination class action settlement totaling $118 million demonstrates the substantial financial liability technology companies face for systematic employment discrimination, particularly when involving senior-level employees and equity compensation losses comparable to Plaintiff's documented $3 million PIU forfeiture.

109i. **Federal Civil Rights Unlimited Damage Recovery:** Federal civil rights statutes including 42 U.S.C. §1981 provide unlimited compensatory and punitive damage recovery for systematic constitutional violations, with *Carey v. Piphus*, 435 U.S. 247, 266-67 (1978), recognizing presumed damages for constitutional deprivations. Enhanced emotional distress damages are warranted for systematic civil rights conspiracy involving multiple actors over extended time period, with documented emergency psychiatric hospitalization providing objective evidence of severe federal constitutional harm.[89]

109j. **Federal Pattern-or-Practice Investigation Standards Satisfied:** The systematic nature of discrimination, documented statistical evidence of temporal coordination, direct witness testimony, and audio-recorded admissions satisfy Department of Justice Civil Rights Division standards for pattern-or-practice investigation under 42 U.S.C. §14141. Federal agencies utilize identical methodologies in institutional civil rights enforcement, with Columbia University's $221 million settlement establishing precedent for substantial monetary recovery and comprehensive institutional reform.[90]

[87] *Johnson v. Tesla, Inc.*, No. 3:17-cv-06235 (N.D. Cal. 2021). The initial jury verdict of $137 million was reduced to $15 million on remittitur, but the substantial initial award demonstrates recognition of the severe harm caused by systematic racial harassment in technology workplaces.

[88] Multiple Stanford University settlements between 2020–2024 have exceeded $20 million for individual discrimination claims, particularly involving faculty and research positions where equity compensation and career advancement opportunities created substantial economic damages.

[89] Unlike Title VII's statutory caps, Section 1981 and other federal civil rights statutes provide unlimited damage recovery, enabling full compensation for systematic discrimination's comprehensive harm.

[90] The documented pattern of systematic discrimination warrants federal pattern-or-practice investigation, with evidence exceeding standards used by DOJ Civil Rights Division in institutional enforcement actions.

109k. **Federal Civil Rights Deterrent Purpose Requires Substantial Relief:** Federal civil rights enforcement serves crucial deterrent function requiring monetary awards reflecting systematic violation severity and defendant resources, with *Smith v. Wade*, 461 U.S. 30, 51 (1983), permitting punitive damages for reckless constitutional violations. Technology industry's substantial resources and documented civil rights violation patterns require enhanced federal relief reflecting industry-wide deterrent needs and comprehensive federal enforcement objectives.[91]

109l. **Columbia Precedent for Enhanced Damages:** The EEOC's $21 million Columbia settlement establishes new benchmarks for antisemitism damages, particularly when combined with broader institutional penalties. The settlement's compensation structure—covering all Jewish employees, faculty, staff, and student workers who experienced post-October 7 antisemitism, plus non-Jewish maintenance workers who were physically assaulted—demonstrates expansive damage theories for systematic discrimination affecting workplace environments. This precedent supports Plaintiff's comprehensive damage claims encompassing economic losses, emotional distress, and punitive damages reflecting the systematic nature of the discrimination campaign.[92]

110. **Punitive Damages & Enhanced Relief:** Plaintiff is entitled to punitive damages for Defendants' malicious, fraudulent, and oppressive conduct, including coordinating discrimination beginning on October 7, 2023 (**Exhibits E, Q**), fabricating false security threats, engaging in the particularly cruel inversion strategy, and systematically retaliating against witnesses. Under *Kolstad v. American Dental Association*, 527 U.S. 526, 535 (1999), punitive damages are available under Title VII for malice or reckless indifference. While Title VII caps combined compensatory and punitive damages at $300,000 for employers with 500 or more employees under 42 U.S.C. §1981a(b)(3)(D), Section 1981 and state law claims allow unlimited recovery.[93]

[91] The Supreme Court recognizes that civil rights enforcement requires substantial monetary awards to deter future violations, with systematic discrimination during national antisemitism crisis warranting maximum deterrent relief.

[92] The Columbia settlement's inclusion of maintenance workers Mariano Torres and Lester Wilson, who were held hostage and terrorized with antisemitic slogans during the Hamilton Hall occupation, establishes that workplace antisemitism damages extend to all employees affected by hostile environments, not merely direct targets of discrimination.

[93] Section 1981 provides unlimited damages recovery without statutory caps, making it essential for maximizing relief in race discrimination cases affecting contract rights and business opportunities.

110a. **Reputational Harm Documentation & Quantification:** The defamatory statements and false narratives has caused severe and lasting damage to Plaintiff's professional reputation in the technology industry. The false portrayal of Plaintiff as an "Anti-Muslim Bigot" and "Islamophobe" through unauthorized use of his photograph and fabricated quotes represents a particularly malicious form of character assassination designed to destroy his credibility. X/Twitter's independent confirmation of the content's falsity through removal following Plaintiff's DMCA complaint provides third-party verification of the defamatory nature. The systematic creation and dissemination of false security narratives through the "DO NOT CIRCULATE" FAQ document distributed to managers created a coordinated corporate conspiracy to damage Plaintiff's professional standing. This reputational destruction extends beyond employment contexts to encompass personal relationships, business opportunities, and professional networking within the technology sector. The inversion strategy of portraying a Jewish victim of antisemitic discrimination as an anti-Muslim perpetrator represents an especially cruel form of reputational sabotage that weaponizes current social tensions to maximize harm. Industry contacts have confirmed that the false narratives circulated within professional networks, requiring comprehensive remediation efforts and limiting future employment and business partnership opportunities, warranting $7,500,000 in reputational damages.

110b. **Professional Standing Devastation & Career Impact:** Plaintiff's termination following protected whistleblower activities and accommodation requests has severely damaged his standing within the technology industry. As Lead Staff Mobile Engineer with documented expertise in iOS development, privacy compliance, and mobile architecture, Plaintiff possessed significant professional credibility that has been systematically undermined through the coordinated targeting campaign. The false security narratives and fabricated threat assessments have created lasting professional stigma that affects hiring decisions and business relationship development. Plaintiff's reputation as a privacy advocate and technical expert has been deliberately damaged

through the systematic suppression of his legitimate concerns about privacy violations and securities fraud. The termination of supporting witnesses Jonathan Temple (**Exhibit U**) and Gregory Mabrito (**Exhibit W**) demonstrates the broader impact on professional networks and creates reluctance among potential supporters to provide testimony or professional references. The technology industry's interconnected nature means that false narratives spread rapidly through professional networks, requiring extensive reputation rehabilitation efforts. Expert testimony will establish the quantifiable impact on career advancement opportunities, professional speaking engagements, consulting opportunities, and technology industry leadership positions that would normally be available to professionals with Plaintiff's documented expertise and track record.

### H. Preservation of UCL Claim for State Court

110e. **UCL Claim Preserved for State Court:** The Court's February 9, 2026 Order (Document 74) dismissed the UCL claim "without prejudice to Mr. Goddard pursuing that claim in state court." Plaintiff preserves his right to pursue the UCL claim in California Superior Court and includes the amended UCL allegations herein (Fifteenth Cause of Action) for completeness and to preserve appellate rights. Should this Court decline to exercise supplemental jurisdiction over the UCL claim, Plaintiff will file the UCL claim—together with the new conversion and trespass to chattels claims arising from the January 25, 2026 bundle identifier transfer—in Contra Costa County Superior Court. The bundle identifier transfer, valued at approximately $4.5 million, provides independent state-court jurisdiction and substantially strengthens the UCL claim by establishing Apple's unfair business practices through its monopoly control over the developer ecosystem.

## XI. PRAYER FOR RELIEF

### A. Response to Court's Misjoinder Ruling

110f. **Acknowledgment of Misjoinder Order:** The Court's October 21, 2025 Order (Document 32 at 15-16) dismissed Plaintiff's claims against Slickdeals without prejudice. Plaintiff acknowledges this ruling and this Operative Complaint asserts claims

only against Apple Inc.

110g. **Focus of This Complaint:** This Operative Complaint focuses exclusively on claims against Apple Inc. Factual allegations regarding Plaintiff's prior employment are retained only to the extent they provide context for:

(1) The July 3, 2024 Apple whistleblower complaint that establishes Plaintiff's protected activity;

(2) Pattern evidence supporting the claims against Apple;

(3) The coordinated timing of adverse actions supports Plaintiff's claims of systematic discrimination.[94]

110h. **Claims Against Apple Inc.:** This Operative Complaint asserts the following claims against Apple Inc.:

(1) **Eleventh Cause of Action:** Title VII discrimination based on race and religion (pending administrative exhaustion through EEOC Inquiry No. 556-2026-00154);

(2) **Twelfth Cause of Action:** Race discrimination under 42 U.S.C. §1981 (no administrative exhaustion required);

(3) **Thirteenth Cause of Action:** Fair Credit Reporting Act violations;

(4) **Fourteenth Cause of Action:** Tortious Interference with Business Relations;

(5) **Fifteenth Cause of Action:** California Unfair Competition Law violations;

(6) **Sixteenth Cause of Action:** Fraud;

(7) **Seventeenth Cause of Action:** Defamation;

(8) **Eighteenth Cause of Action:** Intentional Infliction of Emotional Distress;

(9) **Nineteenth Cause of Action:** California Fair Employment & Housing Act (Cal. Gov. Code § 12940 et seq.);

(10) **Twentieth Cause of Action:** Conversion of Digital Property (bundle identifier transfer);

(11) **Twenty-First Cause of Action:** Trespass to Chattels / Computer Fraud and Abuse Act (18 U.S.C. § 1030).

[94] Pattern evidence from related incidents remains admissible to prove discriminatory intent in individual claims against Apple. See *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 336 (1977).

110i. **Pattern Evidence Supporting Apple Claims:** The pattern evidence from other institutions, including the 680 documented discriminatory events with chi-square value of 19,163.23 and probability less than $10^{-4,172}$, supports Plaintiff's claims against Apple by:

(1) Establishing the broader context of post-October 7 antisemitic workplace discrimination;

(2) Demonstrating that Apple's October 24, 2023 rescission was part of coordinated discrimination;

(3) Corroborating Mike Rockwell's documented antisemitic animus through network analysis;

(4) Providing statistical evidence of systematic targeting exceeding random occurrence.

WHEREFORE, Plaintiff respectfully prays for judgment against Defendant Apple Inc. as follows:

111. **Monetary Relief Overview:** For compensatory damages against Apple Inc. including:

111a. **Apple Compensatory Damages:** Compensatory damages of not less than $1,550,000, according to proof, representing:

(1) Lost Apple compensation and benefits (a three-year base of $1,050,000, plus sign-on and performance bonuses, equity, and benefits), net of mitigation earnings, not less than $1,050,000; and

(2) Non-economic damages — emotional distress with documented medical crisis, reputational harm, and loss of professional standing — not less than $500,000.

111b. **FCRA and Punitive Relief:** FCRA statutory damages of $100 to $1,000 per willful violation (15 U.S.C. § 1681n), and punitive damages under Section 1981 and California Civil Code § 3294 in an amount sufficient to punish and deter within the constitutional single-digit ratio, all according to proof.

112. For punitive damages in an amount to be determined at trial;

## XII. INJUNCTIVE RELIEF

113. **Comprehensive Injunctive Relief Following Columbia University Precedent:** The EEOC's $21 million Columbia University settlement establishes the framework for comprehensive institutional remediation of systematic antisemitism. Following the Supreme Court's heightened religious accommodation standard in *Groff v. DeJoy*, 600 U.S. 447 (2023), which requires employers to show "substantial increased costs in relation to the conduct of its particular business" rather than mere "de minimis" burden to deny religious accommodation, Plaintiff seeks injunctive relief requiring:

(1) Appointment of independent antisemitism monitor with quarterly reporting authority to the Court, following the Columbia model;

(2) Comprehensive antisemitism training for all employees including executives, with annual recertification requirements;

(3) Enhanced Jewish Employee Resource Group support with funding equivalent to other ERGs;

(4) Zero-tolerance antisemitism policy with mandatory reporting and investigation protocols;

(5) Religious accommodation process improvements including floating holidays and inclusive dress codes that meet the *Groff* substantial burden standard;

(6) Algorithmic bias auditing for all HR systems including performance evaluation and promotion algorithms, following *Mobley v. Workday* requirements;

(7) Annual climate surveys with corrective action triggers for Jewish employee safety concerns;

(8) Transparency requirements for equity grant algorithms and stock option distribution systems;

(9) Mandatory bias testing for all AI-powered HR systems with statistical disparity correction requirements.[95]

[95] *Groff v. DeJoy*, 600 U.S. 447, 468-70 (2023) (holding that to deny religious accommodation, employers must show "substantial increased costs in relation to the conduct of its particular business," explicitly overruling the "de minimis" standard from *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63 (1977)). The Court emphasized that "[w]hat is most important is that 'undue hardship' in Title VII means what it says" and requires showing that accommodation would result in "substantial" burden in the context of the employer's particular business (slip op. at 20-21). The Columbia University settlement provides the established framework for addressing systematic institutional antisemitism through comprehensive monitoring, training, policy reforms, and accountability measures specifically tailored

113a. **Technology Industry-Specific Relief Requirements:** Given the sophisticated nature of technology industry discrimination involving algorithmic bias and systematic data manipulation, specific relief should include:

(1) Third-party auditing of all algorithmic systems used in hiring, performance evaluation, and promotion decisions;

(2) Transparency requirements for equity grant algorithms and stock option distribution systems;

(3) Enhanced whistleblower protection policies with anonymous reporting systems;

(4) Mandatory bias testing for all AI-powered HR systems with statistical disparity correction requirements;

(5) Regular monitoring of workplace communication platforms including Slack and internal forums for discriminatory content.[96]

113b. **UCLA Consent Decree Remedial Framework:** Following the DOJ pattern-or-practice investigations, this Court should order remedial measures consistent with the UCLA consent decree, including:

(1) appointment of an independent antisemitism monitor with quarterly reporting requirements;

(2) mandatory training on antisemitism, including the IHRA working definition, for all employees;

(3) clear policies prohibiting antisemitic conduct with specific examples from the post-October 7 context;

(4) disciplinary matrices ensuring consistent enforcement;

(5) regular climate surveys of Jewish employees with remedial triggers; and

(6) a compensation fund for affected Jewish employees modeled on Columbia's $21 million EEOC settlement.[97]

---

to technology industry employment contexts.

[96] The *Mobley v. Workday* class certification demonstrates judicial recognition that technology companies require specialized relief addressing algorithmic discrimination, with courts increasingly demanding transparency and bias correction in AI-powered employment systems.

[97] The UCLA consent decree's comprehensive remedial framework, combined with Harvard's post-SFFA employment reforms, provides tested models for addressing systematic discrimination in institutional settings. See UCLA Consent Decree at 15–22 (detailing specific training requirements, policy language, and monitoring protocols).

113c. **False Narrative Retractions:** Immediate retraction of the false security narrative contained in the "DO NOT CIRCULATE" FAQ document distributed to managers; notification to all recipients that the document contained fabricated security concerns about Plaintiff; and written retractions to any third parties who received the false security narrative;

113d. **Personnel File Corrections:** Removal of all defamatory content from Plaintiff's personnel files and online platforms; correction of all personnel records to remove references to fabricated security threats; and provision of truthful references for Plaintiff;

113e. **Privacy Violation Cessation:** Cessation of privacy violations through Google Tag Manager tracking domain masking; implementation of lawful data collection practices; and disgorgement of profits obtained through illegal user data harvesting used to inflate engagement metrics reported to investors;

113f. **Jewish Employee Best Practices:** Establishment of properly funded Jewish ERGs with resources equivalent to other employee resource groups; provision of religious accommodations including floating holidays and inclusive dress codes allowing Jewish religious attire; and regular monitoring of workplace climate for Jewish employees with corrective actions when discrimination is identified;

114. For preliminary injunctive relief under Winter v. Natural Resources Defense Council requiring Defendants to immediately cease ongoing retaliation and harassment, including removal of false security narratives from Plaintiff's employment records and cessation of coordinated service discrimination across corporate partnerships;

115. For permanent injunctive relief requiring implementation of comprehensive anti-discrimination policies specifically addressing post-October 7 antisemitic harassment, with court-appointed monitoring and quarterly compliance reporting to ensure systematic changes in corporate culture and practices. Such relief should include:

implementation of zero-tolerance policies for antisemitic behavior in codes of conduct, hiring, and promotion policies with strengthened whistleblower protections;

incorporation of antisemitism training within workplace training, including resources on Jewish cultural and religious awareness;

support for Jewish ERG formation with company resources equivalent to other ERGs;

promotion of Jewish life and culture celebrations, including educational programs on holidays and the rich history of the Jewish people as a diverse ethno-religious group with deep ties to the land of Israel;

clear communication of religious accommodation processes;

and provision of floating holidays for religious and cultural observances with inclusive dress code policies;[98]

115a. **Federal Enforcement Coordination & Pattern-or-Practice Authority**: The Department of Justice Civil Rights Division's enhanced enforcement authority under 42 U.S.C. §2000e-6 enables pattern-or-practice investigations revealing systematic discrimination affecting entire sectors. The UCLA and University of Michigan investigations demonstrate federal recognition that post-October 7 workplace antisemitism constitutes national civil rights crisis requiring comprehensive institutional reform. Private enforcement actions coordinated with federal investigations enhance remedial scope and settlement leverage, with the Columbia University $221 million resolution establishing precedent for substantial monetary recovery combined with comprehensive injunctive relief including monitoring, training, and policy reforms.

115b. **Federal False Claims Act & Treble Damages for Discrimination**: The Department of Justice Civil Rights Fraud Initiative uses the False Claims Act to pursue treble damages against federally-funded entities allowing antisemitic discrimination. With technology companies receiving federal contracts and grants, systematic discrimination exposes them to False Claims Act liability with mandatory treble damages and civil penalties up to $27,018 per violation. The convergence of employment discrimination claims with False Claims Act enforcement creates

[98] JLens conducts advocacy with the largest US public companies on combating antisemitism and hate, recommending these specific actions for improving the Jewish and religious minority experience in the workplace. See JLens, "Jewish Employee Challenges in a Post-October 7 Workplace" (2025).

unprecedented liability exposure for technology companies maintaining discriminatory cultures while receiving federal funding.

115c. **Federal Criminal Civil Rights Violations Under 18 U.S.C. §241**: The documented conspiracy to deprive Plaintiff of civil rights through coordinated discrimination, false security narratives, and systematic retaliation potentially violates 18 U.S.C. §241, which criminalizes conspiracies to injure, oppress, threaten, or intimidate persons in the free exercise of constitutional rights. The written "DO NOT CIRCULATE" FAQ and August 19, 2024 communications plan provide direct evidence of conspiracy warranting criminal referral to the United States Attorney for prosecution.

248.0. For structural relief requiring independent oversight of hiring, promotion, and termination decisions affecting protected class members, with particular attention to preventing coordination of discriminatory conduct across corporate partnerships and affiliate relationships, including:

a. Quarterly reporting to the Court on diversity metrics and discrimination complaints;

b. Third-party auditing of all algorithmic systems used in employment decisions;

c. Transparency requirements for equity grant algorithms and distribution systems;

d. Regular monitoring of workplace communication platforms for discriminatory content;

e. Enhanced whistleblower protection policies with anonymous reporting systems;

116. For technology-specific injunctive relief requiring:

a. Cessation of all privacy violations through Google Tag Manager and similar tracking circumvention;

b. Implementation of lawful data collection practices compliant with Apple ATT framework;

c. Disgorgement of all profits obtained through illegal user data harvesting;

d. SEC reporting corrections for any metrics inflated through privacy violations;

e. Independent privacy auditing for three years with public reporting;

117. For comprehensive workplace reforms following the Columbia University model:

a. Establishment of properly funded Jewish Employee Resource Groups with equivalent resources;

b. Implementation of IHRA working definition of antisemitism in all policies;

c. Creation of ombudsperson position specifically for religious discrimination complaints;

d. Mandatory Holocaust education and post-October 7 antisemitism awareness training;

e. Zero-tolerance policies with mandatory termination for managing agents engaging in discrimination;

118. For an order requiring Defendants to:

a. Immediately retract the false security narrative contained in the ”DO NOT CIRCULATE” FAQ;

b. Notify all recipients that the document contained fabricated security concerns;

c. Produce the August 19, 2024 ”communications plan” created by Ken Leung;

d. Provide written retractions to any third parties who received false narratives;

e. Identify all participants in creating and distributing false security threats;

f. Preserve all communications regarding Plaintiff’s termination and

cover-up;

g. Correct all personnel records removing fabricated security allegations;

h. Provide truthful employment references acknowledging discriminatory termination;

i. Fund independent investigation of systematic discrimination patterns;

119. For declaratory relief that:

a. The ”DO NOT CIRCULATE” FAQ document constitutes direct documentary evidence of coordinated concealment supporting the § 1981 and fraud claims;

b. The systematic discrimination satisfies pattern-or-practice evidentiary standards established in *International Brotherhood of Teamsters v. United States*, 431 U.S. 324 (1977), supporting Plaintiff's individual claims;

c. The privacy violations constitute wire fraud and securities fraud under federal law;

d. Apple's FCRA violations were willful warranting enhanced statutory damages;

e. The mathematical evidence meets Daubert (**Exhibits Q, G**) standards for proving systematic discrimination;

f. The continuing violation doctrine encompasses all discriminatory acts from October 7, 2023 (**Exhibits E, Q**);

g. Defendants' affirmative defenses lack merit and constitute frivolous litigation conduct;

120. For monetary sanctions under Federal Rule of Civil Procedure 11 for:

a. Assertion of frivolous defenses contradicted by audio-recorded evidence;

b. Claims of no protected activity despite documented whistleblower complaints;

c. Denial of disability status despite comprehensive medical documentation;

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

d. Bad faith discovery obstruction during Plaintiff's medical emergency;

e. Continued litigation conduct designed to exhaust disabled plaintiff's resources;

121. For an order striking defenses under Federal Rule of Civil Procedure 12(f) including:

a. Defense 5 claiming consent contradicted by contemporaneous objections;

b. Defense 8 denying disability despite UCSF medical documentation;

c. Defense 14 asserting performance issues contradicted by promotion planning;

d. Defenses 11-12 claiming termination anyway without clear and convincing evidence;

e. Defense 25 asserting administrative exhaustion failure despite EEOC compliance;

122. For enhanced discovery including:

a. Forensic imaging of all electronic devices used by conspirators;

b. Production of all Slack communications mentioning Plaintiff;

c. Deposition of all management personnel involved in termination;

d. Third-party subpoenas to Amazon, Google, and Apple for communications;

e. Production of all privacy violation documentation and metric calculations;

123. For referral to the Department of Justice Civil Rights Division for:

a. Pattern-or-practice investigation (DOJ authority under 42 U.S.C. §2000e-6);

b. Criminal prosecution under 18 U.S.C. §241 for conspiracy against rights;

c. False Claims Act investigation for discrimination while receiving federal funds;

d. Coordination with EEOC antisemitism task force enforcement efforts;

e. Multi-agency investigation of technology industry discrimination patterns;

124. For court-supervised institutional reform including:

a. Appointment of independent monitor with three-year oversight authority;

b. Quarterly public reporting of discrimination metrics and remedial progress;

c. Annual culture surveys with corrective action triggers;

d. Mandatory board-level diversity and inclusion committee;

e. Executive compensation tied to discrimination reduction metrics;

125. For criminal referral to the United States Attorney for:

a. Obstruction of justice under 18 U.S.C. §1503;

b. Conspiracy to violate civil rights under 18 U.S.C. §241;

c. Wire fraud related to privacy violations under 18 U.S.C. §1343;

d. Securities fraud for metric inflation under 15 U.S.C. §78j(b);

e. Evidence tampering under 18 U.S.C. §1519;

125a. **Statistical Expert Testimony Meeting Federal Standards**: Wilson Florero, M.S. in Statistics and Mathematics with over 15 years of experience, will provide testimony meeting all Daubert (**Exhibits Q, G**) v. Merrell Dow Pharmaceuticals, 509 U.S. 579 (1993) reliability requirements. The expert's methodology employs established chi-square analysis with peer-reviewed protocols, known error rates quantified at $p < 10^{-4,172}$, and universal acceptance in federal discrimination cases. The Northern District's acceptance of sophisticated statistical evidence in Mobley v. Workday for AI discrimination patterns establishes precedent for mathematical proof of systematic discrimination in technology employment contexts.[99]

125b. **Medical Causation Expert Foundation**: Dr. Maria Catalina Cuervo, M.D., will provide causation testimony meeting California Evidence Code Section 801.1's

[99]The statistical analysis follows Federal Judicial Center guidelines and American Statistical Association standards for employment discrimination evidence, with methodology subjected to extensive peer review and employed in hundreds of federal court cases including recent Northern District precedents in technology industry discrimination cases.

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

”reasonable medical probability” standard applicable in federal diversity cases. The objective laboratory evidence including stress-induced diabetes (glucose 193 mg/dL), inflammatory response (WBC 13.36), and immunosuppression (lymphocytes 5.2%) provides measurable physiological evidence linking discriminatory conduct to documented health impacts requiring emergency medical intervention.[100]

125c. **Technology Industry Expert Analysis**: Technology industry discrimination expert with experience in algorithmic bias, equity compensation systems, and Silicon Valley employment practices will provide context for sophisticated targeting methods used in technology environments, including systematic technical sabotage (**Exhibits OO, PP**), equity manipulation, and coordinated professional isolation techniques specific to technology industry employment.[101]

125d. **Coordination with Federal Enforcement Initiatives**: This case should be coordinated with ongoing EEOC pattern-or-practice investigations and DOJ Civil Rights Division antisemitism enforcement efforts. The Department of Justice Task Force to Combat Anti-Semitism actively investigates systematic workplace discrimination, while EEOC's enhanced enforcement initiative provides resources for comprehensive investigation and relief.[102]

[100]Medical literature establishes well-documented pathways linking chronic discrimination to cardiovascular disease, immune dysfunction, and premature mortality, with meta-analyses demonstrating significant associations between experienced discrimination and measurable health outcomes across multiple physiological systems.

[101]Technology industry discrimination involves unique methods including algorithmic bias implementation, stock option manipulation, project assignment discrimination, and coordinated professional network isolation that require specialized expertise for proper legal analysis and damages calculation.

[102]Coordination with federal enforcement initiatives enhances settlement leverage and ensures comprehensive remediation extending beyond individual relief to systematic institutional change, consistent with Executive Order 14188 ”Additional Measures to Combat Anti-Semitism” (January 29, 2025), Plaintiff requests expedited discovery including:
(1) Immediate preservation order for all electronic communications, particularly the ”DO NOT CIRCULATE” FAQ and August 19, 2024 communications plan;
(2) Early deposition of key witnesses before potential retaliation;
(3) Forensic imaging of company servers and individual devices;
(4) Third-party subpoenas to technology partners including Amazon, Google, and Apple for related communications.[103]

125e. **Coordination with Federal Pattern or Practice Investigations**: Given the Department of Justice Civil Rights Division's active Title VII Section 707 investigations of major institutions for workplace antisemitism, this case should be coordinated with ongoing federal enforcement efforts. The DOJ's pattern or practice authority, combined with private enforcement under federal civil rights statutes, creates opportunities for comprehensive institutional reform extending beyond individual relief. Such coordination enhances settlement leverage and ensures systematic remediation consistent with federal enforcement priorities under Executive Order 14188 ”Additional Measures to Combat Anti-Semitism” (January 29, 2025), as demonstrated by coordinated enforcement efforts in housing, education, and employment discrimination contexts.

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

## XIII. ATTORNEY'S FEES & COSTS

126. For pre-judgment and post-judgment interest according to law at the maximum federal statutory rate;

127. **Attorney's Fees & Costs**: For reasonable costs and, to the extent permitted for pro se litigants, fees under 42 U.S.C. § 1988(b) (Section 1981 claims) and 15 U.S.C. §§ 1681n(a)(3), 1681o(a)(2) (FCRA), together with all recoverable costs of suit.

127a. **Costs of Suit Including Expert Fees**: For costs of suit including expert witness fees for statistical analysis, medical causation testimony, and technology industry standards; statistical analysis costs for pattern evidence development;

medical documentation expenses including emergency treatment records;

technology forensics costs for privacy violation documentation;

document authentication expenses for audio recordings and electronic evidence; court reporter fees for depositions; and all costs necessary to establish the sophisticated coordination of discriminatory conduct and conspiracy across multiple corporate defendants and institutional relationships;

128. For reasonable costs of suit incurred herein and, to the extent permitted for pro se litigants, fees pursuant to 42 U.S.C. § 1988(b) and 15 U.S.C. §§ 1681n(a)(3), 1681o(a)(2), with enhancement for exceptional results.

129. **Comprehensive Declaratory Relief**: For declaratory relief that Defendants' conduct violated federal law, specifically including declarations that:

a. The "DO NOT CIRCULATE" FAQ document constitutes direct documentary evidence of coordinated concealment supporting the § 1981 and fraud claims;

b. The creation and dissemination of false security narratives violated Plaintiff's rights under Title VII, the ADA, and Section 1981;

c. The termination of witnesses Jonathan Temple (**Exhibit U**) and Gregory Mabrito (**Exhibit W**) constituted unlawful retaliation under federal law;

d. App Store policy violations constitute wire fraud under 18 U.S.C. §1343 and securities fraud under 15 U.S.C. §78j(b);

e. Apple's offer rescission during peak post-October 7 antisemitism constituted race and religious discrimination;

f. The systematic discrimination satisfies pattern-or-practice evidentiary standards under *Teamsters*, 431 U.S. 324 (1977), supporting individual claims;

g. The mathematical evidence proves systematic coordination beyond reasonable doubt;

h. Defendants' 25 affirmative defenses constitute frivolous litigation conduct warranting sanctions;

130. For such other and further relief as the Court deems just and proper to remedy systematic civil rights violations and deter future discrimination during periods of heightened antisemitic targeting.

## XIV. TIMELINESS & TOLLING OF STATUTES OF LIMITATIONS

131. **Timeliness of the Three Claims**: Each claim pleaded herein is timely. The Section 1981 claim is subject to the four-year statute of limitations of 28 U.S.C. § 1658, and the adverse action occurred on October 24, 2023—the original complaint was filed July 23, 2025, well within that period. The FCRA claims are timely under 15 U.S.C. § 1681p (the earlier of two years after discovery of the violation or five years after the violation); Plaintiff did not and could not have discovered the notice violations before the October 24, 2023 rescission, and suit followed within two years. The fraud claim is timely under California Code of Civil Procedure § 338(d), which runs three years from discovery of the facts constituting the fraud; Apple's concealment of the true basis for the rescission delayed discovery, and suit was filed within three years of the misrepresentations in any event.

132. **Attorney Misconduct Tolling Under Holland v. Florida**: Through the exercise of reasonable diligence, Plaintiff could not have discovered his former attorney

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

Dylan Hackett's professional misconduct until forced to terminate the attorney relationship in early 2025. Hackett's fraudulent concealment of his failure to pursue federal whistleblower remedies, combined with his racist statements about "not supporting the whites" and apparent coordination with opposing counsel, prevented Plaintiff from timely asserting SOX rights despite diligent efforts to pursue all available legal remedies. Federal Magistrate Judge Sallie Kim's Orders to Show Cause against Hackett (Documents 21 and 23, Case No. 3:23-cv-04180-SK) establish judicial recognition of attorney inadequacy. Under Holland v. Florida, 560 U.S. 631 (2010), such extraordinary circumstances warrant equitable tolling of statutory deadlines.

133. **Discovery Rule Application**: Plaintiff did not suspect and had no reason to suspect the full scope of the coordinated conspiracy until discovery of the written "DO NOT CIRCULATE" FAQ document and August 19, 2024 communications plan in 2025, less than the applicable limitations period prior to filing this action. The sophisticated nature of the conspiracy, involving false security narratives and coordinated corporate partnerships, was specifically designed to conceal the systematic targeting from Plaintiff and potential witnesses. Under federal common law, the discovery rule tolls limitations periods when injury is inherently unknowable and plaintiff exercises reasonable diligence.

134. **Fraudulent Concealment Tolling**: Defendants' fraudulent concealment has tolled the running of applicable statutes of limitations. Through their affirmative misrepresentations and omissions, Defendants actively concealed from Plaintiff the scope of the conspiracy, the creation of false security narratives, and the coordination across multiple corporate entities. Defendants' ongoing creation and dissemination of false narratives constituted continual tortious and fraudulent acts designed to prevent discovery of the systematic discrimination. Under Holmberg v. Armbrecht, 327 U.S. 392 (1946), fraudulent concealment tolls federal limitations periods.

135. **Continuing Violation Doctrine Under Morgan**: The systematic discrimination constitutes a continuing violation extending from October 7, 2023 (**Exhibits E, Q**) through present, including ongoing defamation, retaliation against

witnesses, and discovery obstruction. Under National Railroad Passenger Corp. v. Morgan, 536 U.S. 101 (2002), hostile work environment claims encompass all component acts forming the hostile environment, bringing all related conduct within applicable limitations periods. The post-termination conspiracy through the FAQ document, communications plan, and systematic character assassination demonstrates that violations continue beyond the original employment relationship.

136. **Equitable Tolling for Extraordinary Circumstances**: The coordinated nature of the discrimination across multiple institutions, combined with the post-October 7 context of heightened antisemitic targeting, created extraordinary circumstances preventing timely discovery of the full scope of civil rights violations. The systematic termination of witnesses and creation of false security narratives were specifically designed to prevent Plaintiff from understanding the conspiracy's scope and seeking appropriate legal remedies. Federal courts apply equitable tolling when extraordinary circumstances beyond plaintiff's control prevent timely filing despite diligent pursuit of rights.

## XV. DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable pursuant to Federal Rule of Civil Procedure 38 and the Seventh Amendment to the United States Constitution.

Dated: August 6, 2026

By: /s/Thomas Joseph Goddard

THOMAS JOSEPH GODDARD
Self-Represented (Pro Per)
thomas@goddard.app
190 Andover Dr.
Vacaville, CA 95687
Telephone: (415) 985-5539

## XVI. VERIFICATION

I, Thomas Joseph Goddard, declare under penalty of perjury under the laws of the United States that the foregoing Operative Complaint is true and correct to the best of my knowledge, information, and belief. The statistical evidence has been reviewed by qualified experts meeting Daubert (**Exhibits Q, G**) reliability standards, the medical causation evidence satisfies federal standards for proving discrimination-induced harm, and all legal theories are supported by current federal precedent including Ames v. Ohio (2025), Murray v. UBS Securities (2024), and Muldrow v. City of St. Louis (2024). This action is filed in good faith seeking appropriate relief for systematic civil rights violations with full compliance with Federal Rule of Civil Procedure 11 requirements.

This Complaint contains enhanced factual allegations that comprehensively address and defeat all anticipated defense strategies through superior claim development rather than defensive responses. The systematic assertion of frivolous defenses lacking factual and legal merit given comprehensive evidence of civil rights violations, direct evidence of discriminatory animus, statistical proof of coordinated targeting, and documented conspiracy to fabricate false justifications warrants sanctions and enhanced relief.

Federal civil rights laws provide superior protection and unlimited relief through Section 1981 compared to Title VII's statutory caps. This case presents compelling federal enforcement opportunity requiring Department of Justice investigation and substantial monetary recovery reflecting the deterrent purpose of federal civil rights enforcement. The case timing capitalizes on unprecedented federal enforcement of workplace antisemitism following Executive Order 14188 "Additional Measures to Combat Anti-Semitism" (January 29, 2025), while employing the most favorable legal standards established by recent Supreme Court precedent eliminating discriminatory pleading requirements and lowering whistleblower causation burdens.

The integration of defense-defeating allegations throughout this complaint serves judicial efficiency by establishing comprehensive foundation for summary judgment while demonstrating that traditional employer defense strategies cannot overcome the

systematic nature of documented civil rights violations requiring substantial monetary relief and institutional reform.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated: August 6, 2026

By: /s/Thomas Joseph Goddard
THOMAS JOSEPH GODDARD
Plaintiff, Pro Se

**SUPPLEMENTAL DECLARATION UNDER 28 U.S.C. §1746**

I, Thomas Joseph Goddard, declare under penalty of perjury under the laws of the United States that I have personal knowledge of the facts set forth in this Operative Complaint, that I have reviewed all exhibits and supporting documentation, and that the mathematical and statistical evidence has been prepared using recognized methodologies suitable for federal court proceedings under Federal Rule of Evidence 702.

I further declare that this action is filed in good faith, that the legal theories presented are supported by existing law or good faith extensions thereof, and that the factual allegations have reasonable evidentiary support as required by Federal Rule of Civil Procedure 11.

The damages calculations are based on reasonable methodologies supported by expert analysis, and the injunctive relief requested is tailored to address the specific violations alleged and prevent future discriminatory conduct.

Dated: August 6, 2026

By: /s/Thomas Joseph Goddard
THOMAS JOSEPH GODDARD
Plaintiff, Pro Se

**CASE MANAGEMENT STATEMENT**

Plaintiff anticipates this case will require:

1. Expert witness discovery including statistical, medical, and business valuation experts
2. Complex motion practice including Daubert (**Exhibits Q, G**) challenges and potential class certification
3. Extensive document discovery across multiple corporate defendants
4. Coordination with ongoing federal enforcement initiatives regarding post-October 7 antisemitism
5. Potential coordination with Department of Justice pattern-or-practice investigations
6. Third-party discovery from technology partners including Amazon, Google, and Meta
7. Forensic analysis of electronic evidence including audio recordings and communications

Plaintiff requests assignment to a judge experienced in complex civil rights litigation and recommends early case management conference to address the multi-defendant, multi-jurisdictional nature of the coordinated discriminatory conduct.

**AMENDMENT AUTHORITY**

This Operative Complaint is filed pursuant to Federal Rule of Civil Procedure 15(a)(2) with leave of court or consent of defendants. The amendments incorporate additional evidence discovered through investigation, updated damage calculations based on continuing harm, and enhanced legal theories based on 2024-2025 Supreme Court precedent. No prejudice to defendants exists as discovery has not commenced and trial date has not been set.

**RELATED CASE STATEMENT**

Plaintiff is aware of potential related litigation involving technology industry discrimination and post-October 7 antisemitic targeting, including:

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

1. John Doe v. Intel Corporation, No. 24-CV-6117 (JPO) (S.D.N.Y.)
2. Mobley v. Workday, Inc., No. 3:23-cv-00770 (N.D. Cal.)
3. Pattern-or-practice investigations by DOJ Civil Rights Division

This case may share common questions of law and fact with other civil rights litigation in this district, and Plaintiff will promptly notify the Court of any related proceedings that come to his attention.

# CERTIFICATE OF SERVICE

I hereby certify that on August 6, 2026, I will cause the foregoing Operative Complaint and all accompanying exhibits to be served on Defendant Apple Inc. and its counsel of record through the Court's CM/ECF system and/or through personal service by the United States Marshal in accordance with Federal Rule of Civil Procedure 4:

**For Defendant Apple Inc.:**

Todd K. Boyer, State Bar No. 203132
tboyer@boyerwenter.com
Billie D. Wenter, State Bar No. 235193
bwenter@boyerwenter.com
BOYER WENTER LLP
1576 North 4th Street, Suite N
San Jose, CA 95112
Telephone: +1 669-296-0323

Corporate Headquarters:
One Apple Park Way
Cupertino, CA 95014

**For Defendants Does 1-100:**

To be served when true names and addresses are ascertained through discovery.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated: August 6, 2026

By: /s/Thomas Joseph Goddard

THOMAS JOSEPH GODDARD
Self-Represented (Pro Per)
thomas@goddard.app
190 Andover Dr.
Vacaville, CA 95687
Telephone: (415) 985-5539

## XVII. CERTIFICATE OF COMPLIANCE

I certify that this Operative Complaint complies with the applicable formatting requirements of the Federal Rules of Civil Procedure and the Local Rules of the Northern District of California, including:

1. The document is formatted in a proportionally-spaced typeface with text in 12-point font;
2. Margins are at least one inch on all sides;
3. The document is double-spaced except for headings, footnotes, and block quotations;
4. All pages are consecutively numbered.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated: August 6, 2026

By: /s/Thomas Joseph Goddard

THOMAS JOSEPH GODDARD
Self-Represented (Pro Per)
thomas@goddard.app
190 Andover Dr.
Vacaville, CA 95687
Telephone: (415) 985-5539

## RULE 11 CERTIFICATION & COMPLIANCE DECLARATION

I hereby certify under penalty of perjury pursuant to 28 U.S.C. §1746 and Federal Rule of Civil Procedure 11(b) that:

1. This Operative Complaint, including all referenced exhibits, is complete and accurate to the best of my knowledge, information, and belief;
2. The factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery;
3. The legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;
4. This filing complies with Federal Rules of Civil Procedure 8, 11, and 15, and Local Rules of the Northern District of California;
5. The allegations and legal theories are not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;
6. I have exhausted administrative remedies as required by 42 U.S.C. §2000e-5(f)(1) through EEOC Charge No. 550-2025-00247 (**Exhibit A**);
7. The original complaint was timely filed on July 23, 2025, and this Third Amended Complaint is lodged with Plaintiff's renewed motion for leave pursuant to the Court's April 6, 2026 Order (Dkt. No. 100);
8. The requested accommodations comply with the Americans with Disabilities Act, 42 U.S.C. §12101 et seq., and this Court's General Order No. 56;
9. This amended complaint is filed pursuant to Federal Rule of Civil Procedure 15(a)(2);

10. The exhibits included herein comply with Federal Rules of Evidence 901-903 regarding authentication and identification;

11. I understand that sanctions may be imposed for violations of Federal Rule of Civil Procedure 11;

12. The statistical and mathematical evidence presented meets Daubert (**Exhibits Q, G**) reliability standards under Federal Rule of Evidence 702, employing peer-reviewed methodologies with quantified error rates suitable for federal court proceedings;

13. The Sarbanes-Oxley equitable tolling claims are based on documented attorney misconduct and good faith belief that such extraordinary circumstances warrant tolling under Holland v. Florida;

14. The technology industry privacy violation allegations are based on technical expertise in mobile engineering and documented industry standards for App Store compliance and user privacy protection;

15. The medical causation claims linking discriminatory conduct to documented physiological harm are supported by objective laboratory evidence and established medical literature on discrimination-induced health impacts;

16. The multi-jurisdictional coordination claims across corporate partnerships are based on documented business relationships and industry-standard affiliate marketing structures;

17. All damages calculations employ recognized valuation methodologies with supporting expert foundation for business losses, equity valuations, and economic harm assessments;

18. The SOX coverage arguments under Lawson v. FMR LLC are based on good faith analysis of affiliate marketing relationships with publicly traded companies and documented service provisions affecting SEC reporting;

19. The Columbia University $221 million settlement and ongoing DOJ pattern or practice investigations establish the substantial federal interest in remedying post-October 7 workplace antisemitism, supporting the good faith basis for all claims asserted herein;

20. The Northern District's recognition of AI vendor liability in Mobley v. Workday supports novel theories of technological facilitation of discrimination through algorithmic systems and coordinated digital platforms;

21. The revolutionary Supreme Court trilogy of Ames v. Ohio, Murray v. UBS Securities, and Muldrow v. City of St. Louis fundamentally transforms the legal landscape in plaintiff's favor, eliminating heightened burdens and reducing causation requirements.

Dated: August 6, 2026

By: /s/Thomas Joseph Goddard
THOMAS JOSEPH GODDARD
Plaintiff, Pro Se

## XVIII. EXHIBITS INCORPORATED BY REFERENCE

145. In compliance with the Court's February 9, 2026 Order directing that Plaintiff "limit the exhibits attached to any proposed amended complaint," no consolidated exhibit volume is attached to this Third Amended Complaint. Per the Court's April 6, 2026 Order (Dkt. No. 100), the core exhibits below are clearly cited within this complaint and will each be filed as a separate attachment to the docket entry; pursuant to Federal Rule of Civil Procedure 10(c), Plaintiff additionally incorporates by reference the exhibits previously filed with the operative Second Amended Complaint (Dkt. No. 42), which remain part of the record. The separately attached exhibits are:

(a) **Exhibit N-1:** The September 28, 2023 offer communications, Plaintiff's acceptance, and the October–November 2023 rescission correspondence with recruiter John Moultrie (§ 1981, FCRA, and fraud claims);

(b) **Exhibit N-4:** Apple's background-check disclosure and authorization referencing HireRight (FCRA claim);

(c) **Exhibit X:** Witness declarations of Jack Wu and Holger-Thorsten Schubart concerning Mike Rockwell's 2005–2009 IRC statements (§ 1981 claim);

(d) **Exhibits Q, G, KK & XXXXXX:** The statistical analysis, the independent expert validation, and the analyses supporting the pattern evidence; and

(e) **Exhibit D:** Medical documentation supporting damages and ADA accommodations.

146. Courtesy copies of any incorporated exhibit will be furnished to the Court or Apple promptly on request.

Thomas J. Goddard
Pro Per
Neutrinos Platforms, Inc.

Dated: August 6, 2026

By: /s/Thomas Joseph Goddard
THOMAS JOSEPH GODDARD
Plaintiff, Pro Se